FOR PUBLICATION

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

————————————————————————
————————————————————————  )
UNITED STATES OF AMERICA,               )
                                        )        Civ. No. 01-2120 (HAA)
                        Plaintiff,      )
                                        )        **OPINION AND ORDER**
        –vs.–                           )
                                        )
MARCO PAULO REBELO,                     )
                                        )
                        Defendant.      )
———————————————————————— )

Janice Montana, Esq.
Office of Immigration Litigation
U.S. Department of Justice, Civil Litigation
970 Broad Street
Newark, New Jersey 07102
*Attorney for Plaintiff*

Thomas E. Moseley, Esq.
THE LAW OFFICE OF TOM MOSELEY
One Gateway Center – Suite 2600
Newark, New Jersey 07102
*Attorney for Defendant*


**ACKERMAN, Senior District Judge:**

        This matter comes before the Court on Plaintiff United States of America's (the

"Government") motion for summary judgment and, in the alternative, to strike Defendant's

remaining affirmative defenses.  This matter is also before the Court on Defendant Marco Paulo

Rebelo's ("Rebelo") cross-motion for summary judgment.  For the following reasons, the

1

Government's motion for summary judgment is GRANTED on the ground of illegal procurement of naturalization because Rebelo was convicted of a crime involving moral turpitude during the statutory period.  Rebelo's cross-motion for summary judgment is DENIED.

## I.    BACKGROUND

The Government brings this action to revoke and set aside an order of naturalization of Rebelo, as well as to cancel his certificate of naturalization, pursuant to Section 340(a) of the Immigration and Naturalization Act ("INA"), 8 U.S.C. § 1451(a) (2000).  In its motion for summary judgment, the Government contends that Rebelo was ineligible for naturalization because he had been convicted of a crime involving moral turpitude ("CIMT") during the statutory period in which good moral character is required.  The Government further alleges that Rebelo procured his naturalization by willfully concealing the fact that he was on probation for having committed a CIMT at the time his application for naturalization was approved and he took the oath of allegiance.  Rebelo contends, in contrast, that the Government waited more than five years after learning of his conviction before bringing this action, and therefore should be barred under the applicable statute of limitations from seeking revocation of Rebelo's citizenship.  Rebelo further argues that the underlying crime for which he was convicted was not a CIMT, and maintains that the regulation barring naturalization for applicants who are on probation was not promulgated in accordance with the Administrative Procedures Act, 5 U.S.C. § 553 (2000).  Finally, Rebelo insists that the alleged willful misrepresentation is insufficient, as a matter of law, to bar naturalization, and that in any event his actions did not constitute willful misrepresentation.

Before proceeding further, some background information is necessary.[1]  Rebelo was born on June 27, 1973 in Rhodesia (now Zimbabwe).  The record reflects, however, that Rebelo was of Portugese citizenship at the time his family immigrated to the United States on January 26, 1981.  Rebelo and his family settled in Elizabeth, New Jersey, where Rebelo attended public school.  After dropping out of the twelfth grade, Rebelo matriculated in a program at Lincoln Tech for diesel engineering, but never completed the program.  He subsequently found work as an autobody repairman and mechanic.

Rebelo was residing with his parents at 22 Summer Street in Elizabeth, New Jersey when, on the morning of May 14, 1995, he received a phone call from a friend informing him that his younger brother, Fernando, had been arrested approximately one block from home.  Rebelo woke his father, Alberto Rebelo, who immediately proceeded to the scene.  A short time later, Rebelo followed his father to the scene.  Upon arriving, Rebelo found his brother in the back seat of a police car, his shirt ripped.[2]

---

[1]  The following recitation of facts draws heavily on the parties' respective Rule 56.1 statements.  Rebelo asks to be excused from responding to the Government's Rule 56.1 statement, arguing that the Government's statement is "verbose and argumentative," and that it does not follow a numbered format.  (Def.'s Resp. to Pl.'s Statement Pursuant to L. Civ. R. 56.1, ¶ 1 (citing *Resolution Trust Co. v. Fidelity & Deposit Co.*, Civ. No. 92-1003, 1998 U.S. Dist. LEXIS 3431 (D.N.J. Jan. 27, 1998).)  *Resolution Trust* involved a Rule 56.1 statement that was over 130 pages, a far cry from the 12-page statement that the Government has submitted here.  While the Government perhaps could have presented its Rule 56.1 statement in a more succinct and organized fashion, the Court finds that the Government's statement is nevertheless in compliance with the strictures of L. Civ. R. 56.1.

[2]  The police report filed by the arresting officers indicates that City of Elizabeth police officers had initially observed Fernando running a red light and driving at a high rate of speed with five passengers in his car.  The officers pulled Fernando over and, while writing the summons, "observed the occupants moving around very figidy [sic] in the vehicle."  (Decl. of Counsel, Ex. N.)  Suspicious, the officers ordered the occupants out of the vehicle for a pat-down search, which apparently yielded no weapons.  After being handed the summons and advised that

The police report differs markedly from Rebelo's version of what occurred next.  Officers Merten and Gramiak reported that they were seated in their squad car, filling out a tow form for Fernando's car, when they observed Rebelo and his father approaching them.  Upon learning that Fernando had been arrested, Rebelo's father became "very irrational" and began to shout at the officers.  (Decl. of Counsel, Ex. N.)  The police report also reflects that Rebelo told the officers, "Now is when your real fuckin problems begin."  (*Id.*)  According to the police report, the officers instructed Rebelo and his father to step onto the sidewalk, at which point Rebelo allegedly threw his hat and keys on the hood of the squad car "and took an aggressive stance."  (*Id.*)  At this point, Rebelo allegedly stated, "The only fuckin way I'm going is if you arrest me too."  (*Id.*)  After the officers advised him that he would be arrested if he did not immediately leave, Rebelo purportedly shouted, "Let's fucking go!"  (*Id.*)  It was at this point, according to the police report, that the officers attempted to place Rebelo under arrest.

Rebelo, by contrast, contends that upon seeing Fernando in the back of the squad car with his shirt ripped, Rebelo asked the officers which officer had beaten up his brother.  In response to this query, Officer Gramiak purportedly emerged from the police car and asked Rebelo, in a confrontational manner, "Do you want to fight me?"  Without further provocation, the officer then allegedly grabbed Rebelo, threw him against the police car, and began to choke him.[3]

_____

he was free to go, Fernando allegedly demanded to know the officers' names and made statements to the effect that "[y]ou cops will be sorry."  (*Id.*)  The officers again advised Fernando to leave or he would be arrested.  The police report reflects that Fernando responded "Fine," at which time the officer attempted to place Fernando under arrest.  Fernando attempted to push the officer away, and in the ensuing scuffle Fernando's shirt was ripped.  Ultimately, Fernando was cuffed and placed in the back of the squad car.

[3]  To the extent that Rebelo's lurid version of the facts describes an unlawful arrest, this Court must agree with the Government that Rebelo is absolutely barred from collaterally

(Def.'s Statement Pursuant to L. Civ. R. 56.1, ¶¶ 6-7.)

Despite apparent disagreement over the exact precipitating events, the parties to the incident agree that Officer Gramiak and Rebelo became engaged in a physical struggle as the officer attempted to place Rebelo under arrest.  It is undisputed that Rebelo bit Officer Gramiak's bare forearm during the struggle, and that the officers then punched Rebelo several times and maced him.  Subdued, Rebelo was treated at a hospital for his injuries and later charged with two counts of aggravated assault on a police officer, two counts of resisting arrest, one count of obstructing the administration of law, and one count of making terroristic threats.  The police report reflects that Officer Gramiak required hospital treatment and HIV testing for the bite wound to his arm, which was "bleeding heavily," and that the officer "had to leave work due to his injuries."  (Decl. of Counsel, Ex. N.)

Rebelo, his father Alberto, and his brother Fernando were all placed under arrest following the May 14, 1995 incident.  Although the Government disputes the assertion, Rebelo contends that his father and brother retained Nelson Monteiro to represent them in the subsequent proceedings.[4]  John Ammiano, an attorney who purportedly worked with Mr. Monteiro,

---

attacking the state criminal judgment that was ultimately entered against him.  This Court will afford full faith and credit to the state judgment, and Rebelo will not be heard to argue that his actions on May 14, 1995 constituted a valid act of self-defense, or that the officers effectuated an unlawful arrest on that occasion.

[4]  The Court takes note of the Government's insistence that Mr. Monteiro did not serve as defense counsel for either Alberto Rebelo or Fernando Rebelo.  Special Agent Joseph R. Knuth has certified on behalf of the Government that Alberto Rebelo appeared before the Municipal Court of the City of Elizabeth *pro se*, while Fernando Rebelo appeared before the same court represented by Candido Rodriguez, Jr., Esq.  Indeed, certified records from the administrator of that court confirm the basis for Special Agent Knuth's declaration.  The Government even goes so far as to submit documentary evidence, in the form of a page from the 1995 New Jersey's Lawyer's Manual and Diary, purporting to show that Nelson Monteiro was an Elizabeth

represented Rebelo.[5]  Ultimately, the charges against Rebelo's brother were reduced to a reckless driving ticket, while those against Rebelo's father were dropped down to a disorderly persons offense.  Rebelo's case, however, proceeded in the Union County Superior Court.

On June 11, 1995, while out on bail with charges pending, Rebelo signed an Application for Naturalization, INS Form N-400 ("Application"), under penalty of perjury.  Rebelo's signature on this document constituted a swearing or affirmation that the contents of the Application were true and correct.  Of importance to the instant proceedings, Question 15 of Part 7 of the Application asked, "Have you ever . . . been arrested, cited, charged, indicted, convicted, fined or imprisoned for breaking or violating any law or ordinance excluding traffic regulations?" (Decl. of Alfred Parra, Ex. A at 3.)  Rebelo checked the box indicating "Yes," and, as required, attached a supplement to the Application in which he ostensibly explained the circumstances of his arrest.  The supplement consisted entirely of the following hand-written statement: "Supplement to #15, Elizabeth, N.J., Marco P. Rebelo, May 14, 1995, Disorderly Persons Offense, Charges Dismissed."  It is undisputed that the information provided in the supplement was neither truthful at the time Rebelo signed the Application nor at any time thereafter.  Rebelo

_____

Municipal Court Judge in 1995, and therefore could not have represented Alberto and Fernando Rebelo in their criminal defense.  Though the Government's evidence is powerful, this Court recognizes an issue of material fact when it sees one, and must, for purposes of these summary judgment motions, accept as true the facts asserted by the nonmoving party.  Accordingly, in adjudicating the Government's and Rebelo's respective motions for summary judgment, the Court will take care to consider only those disputed facts asserted as true by the respective nonmovants.

[5]  The Court again pauses to note the Government's contention that Mr. Ammiano did not work out of Nelson Monteiro's office, but conducted his own independent legal practice.  This Court will not attempt to resolve this factual dispute, and will merely accept as true that version of the facts asserted by the nonmoving party.

6

does contend, however, that he was simply following the advice of his father's attorney, Mr. Monteiro, when he answered Question 15 as he did.  Without denying that the supplement contained his response to Question 15, or that he read the supplement before signing the completed Application, Rebelo further notes that the supplement was not in his handwriting.

On July 5, 1995, the day before Rebelo's case was slated for disposition in the Union County Superior Court, Rebelo filed his Application with the Immigration and Naturalization Service ("INS").  It is undisputed that on this date, Rebelo remained on bail with six charges pending against him in the Superior Court, including two counts of aggravated assault on a police officer.

On July 6, 1995, Rebelo appeared in the Union County Superior Court and signed a written Plea Agreement.  Rebelo entered a guilty plea and was convicted of aggravated assault in the third degree pursuant to N.J.S.A. 2C:12-1b.(5)(a), a felony offense.  A conviction for a crime of the third degree is punishable by incarceration for a period of three to five years, pursuant to N.J.S.A. 2C:43-6a.(3).  The Superior Court judge nevertheless sentenced Rebelo to two years of probation, commencing on September 8, 1995 and ending on July 14, 1997.  Rebelo does not dispute the fact of his conviction of aggravated assault in the third degree.

Based upon the information Rebelo provided, the INS approved Rebelo's Application on October 31, 1995.  Rebelo took the oath of allegiance on December 7, 1995 and received Certificate of Naturalization No. 21 797 328 on the same day.  It is undisputed that at the time Rebelo's Application was approved and at the time he was administered the oath of allegiance, Rebelo had not informed the INS of the disposition of the criminal charges against him.

On November 4, 1997, the INS, having learned of Rebelo's criminal history, issued a

Notice of Intent to Revoke ("NOIR").  The NOIR alleged that Rebelo's response to Question 15 of his Application indicated that he had been arrested for a disorderly persons offense that was later dismissed, when in fact he had ultimately been convicted of aggravated assault and sentenced to a two-year term of probation.  Thus, pursuant to Section 340(h) of the INA, as well as 8 C.F.R. § 340.1, the INS sought to revoke Rebelo's naturalization on two grounds.  First, the INS contended that Rebelo had been ineligible for naturalization because he was "not a person of good moral character" at the time he took the oath of allegiance.  (Decl. of Counsel, Ex. U at 2.)  By law, a conviction for a CIMT precludes an applicant from establishing good moral character and, according to the INS, the crime of aggravated assault of which Rebelo was convicted was a CIMT.  Second, the INS alleged that Rebelo had procured his naturalization "by willful misrepresentation or concealment of a material fact."  (*Id.*)  Specifically, the INS contended that because Rebelo knew that a truthful answer to Question 15 would have rendered him ineligible for naturalization, he therefore willfully concealed and misrepresented the circumstances surrounding his arrest, conviction, and sentence.

In 1998, shortly after denaturalization proceedings commenced against Rebelo, the District Court for the Western District of Washington enjoined the INS's administrative denaturalization process upon concerns that the pertinent INS regulations exceeded that agency's authority under the INA.  The Court of Appeals for the Ninth Circuit subsequently declared the administrative denaturalization process invalid.  *See Gorbach v. Reno*, 219 F.3d 1087 (9th Cir. 2000) (en banc).  Thereafter, as the *Gorbach* court observed, the Government could pursue denaturalization proceedings only by bringing an action in a United States District Court.  *Id.* at 1099.  After having stayed its denaturalization proceedings pending the outcome of the *Gorbach*

case, the Government initiated the instant action against Rebelo on May 2, 2001, a little more

than nine months after the Ninth Circuit's final decision in *Gorbach*, and more than five years

after Rebelo obtained naturalization.

On July 3, 2002, the Government filed a motion to strike Rebelo's affirmative defenses

and seeking a protective order barring discovery relating to those defenses.  In an Order dated

March 11, 2003, this Court granted in part and denied in part the Government's motion.  *See*

*United States v. Rebelo*, No. 01-2120 (D.N.J. Mar. 10, 2003) (order granting in part and denying

in part motion to strike certain affirmative defenses and for protective order).  The Government

now moves for summary judgment, or in the alternative, to strike Rebelo's remaining affirmative

defenses.  Rebelo cross-moves for summary judgment on several grounds.

## II.   ANALYSIS

In any motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, the

moving party bears the burden of demonstrating that "there is no genuine issue as to any material

fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c);

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  A district court considering a

plaintiff's motion for summary judgment must ascertain whether a reasonable jury could find, on

the evidence presented, "*either* that the plaintiff proved his case by the quality and quantity of

evidence required by the governing law *or* that he did not."  *Anderson*, 477 U.S. at 254.  Thus, a

court must consider the substantive evidentiary standards that apply in the case and must grant

summary judgment only where, drawing all justifiable inferences in favor of the non-movant, the

court is persuaded that a reasonable jury could have returned a verdict for the movant on the

evidence presented.  *Id.* at 255.  Where the motion for summary judgment arises in an action to

9

divest a naturalized citizen of his citizenship, the Government bears a particularly heavy burden of proof. *United States v. Breyer*, 41 F.3d 884, 889 (3d Cir. 1994).

Apart from its burden of proof, the Government, in moving for summary judgement in a denaturalization proceeding, must also meet an initial burden of production. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *United States v. Reve*, 241 F. Supp. 2d 470, 475 (D.N.J. 2003). To meet its initial burden of production, the Government must "inform[] the district court of the basis for its motion, and identify[] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (internal quotations omitted). The evidence that the Government produces in support of its motion for summary judgment in a denaturalization proceeding "must be clear, unequivocal, and convincing and not leave the issue in doubt." *Breyer*, 41 F.3d at 889 (internal quotations omitted).

When the Government has carried its initial burden, the burden of production shifts to the non-movant. The non-movant must then present evidence establishing the existence of a genuine issue of material fact requiring resolution at trial. *Reve*, 241 F. Supp. 2d at 475. This evidence need not necessarily be admissible at trial, *Celotex*, 477 U.S. at 324, but it must be actual evidence that rises above mere allegations, and, above all else, it must raise a genuine issue of material fact, *Reve*, 241 F. Supp. 2d at 475.

A district court faced with a summary judgment motion must view all evidence and the inferences to be drawn therefrom in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). It is inappropriate for a district court to resolve factual disputes or make credibility determinations at the summary

10

judgment stage. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). Indeed, "where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Id.* This does not mean, however, that a district court may ignore the weight of the evidence. *Id.* "[I]f the non-movant's evidence on any essential element of the claims asserted is merely 'colorable' or is 'not significantly probative,' the court should enter summary judgment in favor of the moving party." *Peterson v. Am. Tel. & Tel. Co.*, Civil Action No. 99-4982, 2004 U.S. Dist. LEXIS 854, at *12 (D.N.J. Jan. 9, 2004) (quoting *Anderson*, 477 U.S. at 249).

### A.      Whether the Government's Action Is Time-Barred

Section 340(a) of the INA, 8 U.S.C. § 1451(a) (2000),[6] provides authority for a United States Attorney to initiate an action in an appropriate district court seeking to revoke an order admitting a person to citizenship and to cancel his or her certificate of naturalization. The statute provides that a district court may grant such relief if either "such order and certificate of naturalization were illegally procured or were procured by concealment of a material fact or by willful misrepresentation." *Id.* Accordingly, the Government has brought this denaturalization action pursuant to two separate theories: (1) that Rebelo illegally procured his certificate of naturalization; and (2) that Rebelo procured his certificate of naturalization by willful misrepresentation or concealment of a material fact. The Government now moves this Court for summary judgment on each of these two grounds.

In response to the Government's motion for summary judgment, Rebelo has filed a cross-

---

[6] Here and throughout this Opinion, the Court will cite to the current version of the United States Code, except where the current version differs substantively from the version that was in effect at the time Rebelo applied for naturalization.

motion for summary judgment, invoking several theories.  His first argument is that the Government's action should be dismissed as having been untimely filed.  Rebelo notes that 28 U.S.C. § 2462 requires that any action for enforcement of "any civil fine, penalty, or forfeiture, pecuniary or otherwise" be commenced no later than five years after the date on which the claim accrued.  Characterizing loss of citizenship as both a "forfeiture" and a "penalty" within the meaning of the statute, Rebelo urges this Court, as a matter of first impression, to construe the federal "catch-all statute of limitations" to cover actions by the Government seeking revocation of naturalization.  (Def.'s Br. in Opp'n to Government's Mot. for Summ. J. & to Strike & Supp. of Def.'s Cross Mot. for Summ. J. at 7.)  As such, Rebelo posits that the Complaint in the instant case, which the Government filed on May 2, 2001, was filed more than five years after the cause of action accrued, and therefore was untimely.

    In an Opinion and Order dated March 10, 2003, this Court considered the Government's motion to strike Rebelo's affirmative defense relating to the statute of limitations.  On that occasion, the Court denied the Government's motion to strike, writing that "[t]he law on the issue of the applicability of § 2462 to denaturalization cases is not entirely clear, and neither party has cited any case in the past 60 years directly addressing this issue."  *United States v. Rebelo*, No. 01-2120, order at 6 (D.N.J. Mar. 10, 2003) (granting in part and denying in part motion to strike certain affirmative defenses).  While caselaw regarding the applicability of Section 2462 to denaturalization proceedings continues to be unclear, the question is now ripe for adjudication as a matter of law.  *See United States v. A Parcel of Land, Buildings, Appurtenances & Improvements, Known as 92 Buena Vista Ave., Rumson, N.J.*, 937 F.2d 98, 100 (3d Cir. 1991) (stating that whether the Government's claim was barred by a statute of limitations was a

question of law, subject to plenary review).

Rebelo relies upon 28 U.S.C. § 2462, which provides as follows:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

28 U.S.C. § 2462 (2000).  Known as the "catch-all" statute of limitations, this provision applies where Congress has not otherwise provided for a limitations period in a statute.  *See Fed. Election Comm'n v. Nat'l Republican Senatorial Comm.*, 877 F. Supp. 15, 17 (D.D.C. 1995). Indeed, the INA contains no express period of limitations for initiating denaturalization proceedings, *see Petition of Cardines*, 366 F. Supp. 700, 703 (D. Guam 1973), presenting the possibility that the catch-all statute of limitations applies.  Statutes of limitations do not ordinarily run against the United States, however, so courts must strictly construe Section 2462. *United States v. Davio*, 136 F. Supp. 423, 427 (E.D. Mich. 1955); *see also E.I. Du Pont de Nemours & Co. v. Davis*, 264 U.S. 456, 462 (1924) ("Statutes of limitation sought to be applied to bar rights of the government, must receive a strict construction in favor of the government."). The catch-all statute of limitations has particular applicability to penalty actions, *Fed. Election Comm'n*, 877 F. Supp. at 18, and Rebelo urges this Court to construe "penalty or forfeiture" to include revocations of naturalization.  The United States Supreme Court, interpreting the predecessor statute to 28 U.S.C. § 2462,[7] has said that "penalty or forfeiture" means "something

---

[7]  The predecessor statute, 28 U.S.C. § 791 (1940), was substantively identical to the present statute.  Like the present statute, the predecessor statute imposed a five-year statute of limitations for a "suit or prosecution for any penalty or forfeiture, pecuniary or otherwise, accruing under the laws of the United States."  28 U.S.C. § 791 (1940).

imposed in a punitive way for an infraction of public law." *Meeker v. Lehigh Valley R.R. Co.*, 236 U.S. 412, 423 (1915).  Where the liability sought to be enforced is not punitive, but rather "strictly remedial," the catch-all statute of limitations does not apply.  *Id.*

In support of his argument that Section 2462 should apply to denaturalization proceedings, Rebelo places great emphasis on *Klapprott v. United States*, 335 U.S. 601 (1949), an opinion in which the United States Supreme Court wrote that "[t]his Court has long recognized the plain fact that to deprive a person of his American citizenship is an extraordinarily severe penalty." *Id.* at 612.  Likewise, Rebelo cites *United States v. Kungys*, 575 F. Supp. 1208, 1211 (D.N.J. 1983), which refers to "forfeiture of citizenship under 8 U.S.C. Section 1451(a)." But judicial characterizations such as these do not stand for so weighty a proposition as Rebelo ascribes to them.  Despite the fact that courts on occasion refer to revocation of naturalization as a "forfeiture" of citizenship, it is well established that "the purpose of the denaturalization statute is not to punish citizens, but to protect the integrity of the naturalization process." *United States v. Kairys*, 782 F.2d 1374, 1382 (7th Cir. 1986); *see also United States v. Mandycz*, 351 F.3d 222, 225 n.1 (6th Cir. 2003) ("Denaturalization proceedings are technically considered suits in equity, not criminal actions."); *United States v. Failla*, 164 F. Supp. 307, 314 (D.N.J. 1958) (stating that denaturalization proceedings are civil, not criminal actions).  Indeed, the United States Supreme Court has noted that "[d]enaturalization is not imposed to penalize the alien for having falsified his application for citizenship; if it were, it would be a punishment.  Rather, it is imposed in the exercise of the power to make rules for the naturalization of aliens." *Trop v. Dulles*, 356 U.S. 86, 98 (1958).  Accordingly, it seems abundantly clear to this Court that, though revocation of naturalization undoubtedly has an incidental punitive effect, punishment is not the *raison d'etre*

of denaturalization.  *See E.B. v. Verniero*, 119 F.3d 1077, 1101-02 (3d Cir. 1997)

("[D]enaturalization as a remedy for citizenship fraudulently obtained is regarded not as

punishment but as a necessary part of regulating naturalization of aliens.").

Section 340(a) of the INA, 8 U.S.C. § 1451(a), operates to render an unlawfully obtained

certificate of naturalization void *ab initio*.  8 U.S.C. § 1451(a) ("[S]uch revocation and setting

aside of the order admitting such person to citizenship and such canceling of certificate of

naturalization shall be effective as of the original date of the order and certificate, respectively.").

Commonly known as the "relation back" theory of denaturalization, this retroactive effect has

been an accepted feature of immigration law for nearly a century.  *See Johannessen v. United

States*, 225 U.S. 227 (1912) (holding that the retroactive effect of a denaturalization order does

not violate the prohibition against ex post facto laws).  "The effect of cancellation of

naturalization ab initio is to render the original order of naturalization and certificate of

naturalization completely null and void for purposes of derivation of citizenship benefits from

such naturalization."  Daniel Levy, *U.S. Citizenship and Naturalization Handbook* § 14:30

(2004) (citing *Rosenberg v. United States*, 60 F.2d 475, 476 (3d Cir. 1932)).

The foregoing principles are entirely consistent with the proposition that denaturalization

is remedial in nature, while providing no support for Rebelo's contention that it is punitive.

"Relation back" is the necessary incident of effectively policing the standards for naturalization.

*See Rosenberg*, 60 F.2d at 476 (applying a "relation back" theory because failure to do so, i.e., by

assuming valid citizenship up to the point of denaturalization, would "fly in the face" of the fact

that naturalization standards had never been satisfied).  More than ninety years ago, the United

States Supreme Court explained the connection between the "relation back" theory and the need

15

to enforce the INA's provisions:

> [An applicant for citizenship] can only become a citizen upon and after a strict compliance with the acts of Congress.  An applicant for this high privilege is bound, therefore, to conform to the terms upon which alone the right he seeks can be conferred.  It is his province, and he is bound, to see that the jurisdictional facts upon which the grant is predicated actually exist, and if they do not he takes nothing by his paper grant.

*Johannessen*, 225 U.S. at 240-41 (quoting *United States v. Spohrer*, 175 F. 440 (C.C.N.J. 1910)).

The "relation back" theory, which Congress codified in the Immigration and Nationality Act of

1952, *see Costello v. I.N.S.*, 376 U.S. 120, 129 (1964), gives force and effect to the standards for

naturalization set forth in the INA.  In this respect, the "relation back" theory evinces a remedial,

not a punitive, rationale.

It is also settled that 28 U.S.C. § 2462 has no application where the violation is

continuing.  2 *Immigr. Law & Defense* § 12:38 (2004); *see also Havens Realty Corp. v. Coleman*,

455 U.S. 363, 380 (1982) (stating that statutes of limitations do not ordinarily run where the

violation is continuing).  Speaking in the closely related context of deportation, the Supreme

Court has instructed that "[t]he purpose of deportation is not to punish past transgressions but

rather to put an end to a *continuing violation* of the immigration laws."  *I.N.S. v. Lopez-Mendoza*,

468 U.S. 1032, 1039 (1984) (emphasis added); *see also Reno v. Am.-Arab Anti-Discrimination*

*Comm.*, 525 U.S. 471, 491 (1999) ("[D]eportation is necessary in order to bring to an end an

ongoing violation of United States law.").  Denaturalization actions, like deportation

proceedings, do not purport to punish an individual for past transgressions.  Rather, they give

force and effect to the standards set forth in the immigration laws by stripping from those who

would violate them the veneer of legitimacy that a wrongfully obtained certificate of

naturalization imparts.  As noted already, the "relation back" theory operates to render a wrongfully obtained certificate of naturalization a nullity from its inception.  It stands to reason, therefore, that from the time such a certificate issues until the time its issuance is declared null and void, its holder has enjoyed the fruits of citizenship that only a valid certificate of naturalization can legally provide, but without having satisfied the requirements of the immigration laws.  In this sense, the defendant's violation is ongoing.

It is also questionable whether 28 U.S.C. § 2462 applies to actions in equity.  The Third Circuit has never addressed this precise question, but other circuits generally have held that the catch-all statute of limitations is not available in equity suits.  *See United States v. Banks*, 115 F.3d 916, 919 (11th Cir. 1997) ("The statute [Section 2462] is enforced against the government only when the government is acting to vindicate private interests, not a sovereign or public interest."), *cert. denied*, 522 U.S. 1075 (1998); *United States v. Telluride Co.*, 146 F.3d 1241, 1248-49 (10th Cir. 1998) (citing *Banks*); *cf. Fed. Election Comm'n v. Williams*, 104 F.3d 237, 240 (9th Cir. 1996) (permitting application of Section 2462 to an equitable claim "because the claim for injunctive relief is connected to [a] claim for legal relief"), *cert. denied*, 522 U.S. 1015 (1997).  A denaturalization action is an action in equity.  *Knauer v. United States*, 328 U.S. 654, 671 (1946).  Accordingly, the availability of Section 2462 in denaturalization actions is questionable at best.

The remedial basis of 8 U.S.C. § 1451(a), the continuing nature of the alleged violation, and the equitable character of the denaturalization action all militate strongly in favor of a conclusion that the catch-all statute of limitations does not apply in the denaturalization context.  Indeed, a review of federal caselaw reveals no decision applying the catch-all limitations period

of Section 2462 to the context of a naturalization revocation action brought under Section 340(a) of the INA, 8 U.S.C. § 1451(a).  Two decisions provide limited persuasive authority for the Government's position.  In *United States v. Hauck*, 155 F.2d 141 (2d Cir. 1946), the Second Circuit refused to apply 28 U.S.C. § 791, the predecessor statute to Section 2462, in the context of denaturalization actions, calling it "completely irrelevant."  *Hauck*, 155 F.2d at 143.  *Hauck* in turn cited *United States v. Brass*, 37 F. Supp. 698 (D.C.N.Y. 1941), an action to revoke a fraudulently procured certificate of naturalization in which the defendant argued that the fact of his prior convictions was a matter of public record and therefore the Government should be barred for having waited longer than the five-year statute of limitations of 28 U.S.C. § 791 before bringing the action.  The Court rejected this argument, finding Section 791 inapplicable in the denaturalization context.  A denaturalization action, the court wrote, "is not brought to deprive a litigant of the fruits of a successful controversy in the Courts, as the proceedings for naturalization are not in any proper sense adversary proceedings, but are ex parte and conducted by the applicant for his own benefit."  *Brass*, 37 F. Supp. at 700; *see also United States v. Kichin*, 276 F. 818, 821 (D.C. Mo. 1921) ("Many cases are to be found wherein [denaturalization] actions such as this were brought more than five years after the issuance of the certificate of naturalization.").

Hauck*, *Brass*, and earlier decisions are vulnerable on the ground that they were decided under 28 U.S.C. § 791, a different statute than the present-day catch-all statute of limitations. Rebelo further attacks *Hauck* and *Brass* for having been decided before the Supreme Court's characterization of denaturalization as a "severe penalty" in *Klapprott*.  Section 791, however, is substantively identical to Section 2462, as both utilize the same "penalty or forfeiture, pecuniary

or otherwise" language.  Moreover, as this Court has already observed, Rebelo's reliance on

*Klapprott*'s characterization of denaturalization as a "penalty" is misplaced.  Rebelo, in the end,

fails to muster even a single case in which a federal court has applied 28 U.S.C. § 2462 or its

predecessor statute, 28 U.S.C. § 791, in the context of a denaturalization action.  Therefore, in

accordance with the strict construction of Section 2462 that this Court is bound to apply, the

Court finds that the weight of authority falls decidedly in favor of the Government's position that

28 U.S.C. § 2462 does not apply to denaturalization proceedings under 8 U.S.C. § 1451(a).

Rebelo nevertheless argues that 28 U.S.C. § 2462 should apply in the limited instance

where the facts giving rise to the cause of action

> are literally a matter of public record and within the government's own files more
> than five years before suit was instituted. . . . In other words, when the government
> fails to follow its own procedures in the first place, busy federal courts should not be
> burdened with litigation that the government is tardy in bringing, especially when
> based upon public record information that was in the government's possession all
> along, and certainly more than five years before suit was instituted.

(Def.'s Br. in Opp'n to Government's Mot. for Summ. J. & to Strike & Supp. of Def.'s Cross

Mot. for Summ. J. at 9.)  In making what appears to be an equity argument, Rebelo refers to the

fact that as part of the procedure for filling out the naturalization form N-400 on June 11, 1995,

his fingerprints were taken and subsequently submitted to the INS, along with the completed

Application, on July 5, 1995.  The INS then turned the fingerprints over to the Federal Bureau of

Investigations for routine analysis.  Before the FBI performed its analysis and reported the results

back to the INS, however, the INS, on October 31, 1995, approved Rebelo's Application.  By

failing to await the results of the FBI's fingerprint analysis, Rebelo contends, the INS violated its

own practice.  Therefore, Rebelo urges this Court to apply 28 U.S.C. § 2462 as a time bar to the

instant action, in effect punishing the Government for the INS's alleged noncompliance with internal practice.

The Government characterizes this defense as being essentially one of estoppel.  (Reply on Behalf of Pl. to Def.'s Rule 56.1 Statement, to Def.'s Resp. to Pl.'s Rule 56.1 Statement, and to Def.'s Exs. C & D Attached to the Moseley Decl. at 8.)  In its March 10, 2003 Opinion and Order, this Court acknowledged that Rebelo's conviction had been a matter of public record since September 1995, but nevertheless struck the affirmative defense of estoppel.  The Court held that the equitable defense of estoppel did not operate against the INS.  *See INS v. Pangilinan*, 486 U.S. 875, 883 (1988) ("[N]ormal estoppel rules applicable to private litigants [do] not apply to the INS since . . . [the INS] is enforcing the public policy established by Congress.").  Estoppel, however, requires "1) words, acts, conduct or acquiescence causing another to believe in the existence of a certain state of things; 2) wilfulness or negligence with regard to the acts, conduct or acquiescence; and 3) detrimental reliance by the other party upon the state of things so indic[a]ted."  *In re Vertientes, Ltd.*, 845 F.2d 57, 61 (3d Cir. 1988) (internal quotation omitted).  Here, no argument is made that Rebelo suffered detrimental reliance as a result of the INS's issuance of a certificate of naturalization before receiving the results of the FBI's fingerprint analysis.  The Court will not infer detrimental reliance where none is asserted, and must conclude that Rebelo's argument is not, as the Government maintains, rendered "irrelevant" as a result of the March 10, 2003 Opinion and Order.

Rebelo's argument can more aptly be described as a defense of laches.  Laches, unlike estoppel, requires no showing of detrimental reliance by the aggrieved party.  *See Miyano Mach. USA Inc. v. Zonar*, No. 92 C 2385, 1995 U.S. Dist. LEXIS 890, at *4-*5 (N.D. Ill. Jan. 25, 1995).

The distinction is crucial because this Court, in its March 10, 2003 Opinion and Order, refused to strike Rebelo's affirmative defenses of laches, waiver, negligence, and unclean hands. Citing a lack of Third Circuit and Supreme Court precedent to the contrary, this Court found no authority controlling the question whether these equitable defenses were available as a matter of law in a denaturalization action. The Court distinguished *Reve*, a denaturalization action granting summary judgment to the government on the defendant's equitable defenses of waiver, estoppel, and laches, on the ground that the defendant in that case had been permitted to conduct limited discovery in support of his equitable defenses. In the present posture of the instant case, Rebelo, too, has been afforded an opportunity to conduct discovery in support of his remaining equitable defenses. Thus, the time is now ripe for this Court to revisit the question whether the equitable defenses of laches, waiver, negligence, and unclean hands are available as a matter of law in a denaturalization action.

Laches requires a showing of "(1) lack of diligence by party against whom the defense is asserted and (2) prejudice to the party asserting the defense." *United States v. Koreh*, 59 F.3d 431, 445 (3d Cir. 1995). The party asserting the defense bears the burden of proof. *Waddell v. Small Tube Prods., Inc.*, 799 F.2d 69, 74 (3d Cir. 1986). Nowhere in Rebelo's briefing papers does he make the argument that he has suffered prejudice as a result of the Government's alleged lack of diligence. Neither has Rebelo carried his burden of establishing waiver, negligence, or unclean hands on the part of the Government. Accordingly, this Court need not reach the broader question whether Rebelo's remaining equitable defenses are available as against the Government in a denaturalization proceeding. The Court finds, as a matter of law, that Rebelo has failed to establish the requisite elements of his remaining equitable defenses. *See Koreh*, 59 F.3d at 445-

46 (declining to decide the availability of laches as a defense against the Government in a denaturalization action because defendant had failed to demonstrate specific prejudice as a result of Government's alleged lack of diligence); *Reve*, 241 F. Supp. 2d at 478 (granting summary judgment to the government on defendant's equitable defenses in denaturalization action).

      To the extent that Rebelo's argument for limited application of 28 U.S.C. § 2462 is not an application for equitable relief, Rebelo's argument must also fail.  Setting aside whatever merits Rebelo's argument may have as a matter of sound public policy, there is simply no basis in the law for the limited exception he seeks.  The Government does not dispute that the INS approved Rebelo's Application before receiving the results of the FBI's fingerprint analysis, nor that had the INS awaited those results, it would have learned of Rebelo's criminal conviction.  Yet, as this Court has already noted, denaturalization is not a "penalty or forfeiture" within the meaning of 28 U.S.C. § 2462, and is not made so by the Government's alleged tardiness in instituting suit.   The federal catch-all statute of limitations is inapplicable to denaturalization actions.

    **B.**    **Whether Rebelo Qualifies for the Safeharbor of 8 U.S.C. § 1182(a)(2)**

      The INA specifies that no person shall be naturalized unless that person, "during all the periods referred to in this subsection has been and still is a person of good moral character."  8 U.S.C. § 1427(a)(3) (2000).  Those relevant periods include, inter alia, the "five years immediately preceding the date of filing" an application for naturalization, as well as the period extending "from the date of the application up to the time of admission to citizenship."  *Id.* Section 101(f)(3) of the INA, 8 U.S.C. § 1101(f)(3), provides that

> [n]o person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established, is, or was–

. . . .

(3) a member of one or more of the classes of persons, whether inadmissible or not, described in . . . subparagraphs (A) and (B) of section 1182(a)(2) of this title and subparagraph (C) thereof of such section . . . if the offense described therein, for which such person was convicted or of which he admits the commission, was committed during such period.

8 U.S.C. § 1101(f)(3) (2000).  Subparagraph (A)(i) of Section 1182(a)(2) provides that "any alien convicted of, or who admits having committed, or who admits committing acts which constitute the essential elements of . . . a crime involving moral turpitude (other than a purely political offense) or an attempt or conspiracy to commit such a crime . . . is inadmissible."  8 U.S.C. § 1182(a)(2)(A)(i) (2000).  Thus, read together, these provisions preclude the naturalization of any individual who committed a CIMT during the relevant period.

An exception is found in Section 212(a)(2) of the INA, 8 U.S.C. § 1182(a)(2).  Notwithstanding the ineligibility of individuals who committed CIMTs during the relevant period, this section provides a safeharbor to those individuals

who committed only one crime if . . . the maximum penalty possible for the crime of which the alien was convicted (or which the alien admits having committed or of which the acts that the alien admits having committed constituted the essential elements) did not exceed imprisonment for one year and, if the alien was convicted of such crime, the alien was not sentenced to a term of imprisonment in excess of 6 months (regardless of the extent to which the sentence was ultimately executed).

8 U.S.C. § 1182(a)(2)(A)(ii)(II).  As noted already, Rebelo was sentenced to two years of probation for having committed aggravated assault in the third degree, a crime punishable by incarceration for a period of three to five years.  *See* N.J.S.A. 2C:43-6a.(3) (1995).[8]  Rebelo

---

[8]  N.J.S.A. 2C:43-6a. provides that "[e]xcept as otherwise provided, a person who has been convicted of a crime may be sentenced to imprisonment, as follows: . . . In the case of a crime of the third degree, for a specific term of years which shall be fixed by the court and shall be between three years and five years."

argues, however, that the "except as otherwise required" language of N.J.S.A. 2C:43-6a. requires

this Court to apply the statutory presumption found under N.J.S.A. 2C:44-1e.  That section of the

New Jersey Statutes, subject to certain exceptions, provides the following:

> The court shall deal with a person convicted of an offense other than a crime of
> the first or second degree, who has not previously been convicted of an offense,
> without imposing a sentence of imprisonment unless, having regard to the nature
> and circumstances of the offense and the history, character and condition of the
> defendant, it is of the opinion that his imprisonment is necessary for the protection
> of the public under the criteria set forth in subsection a. . . .

N.J.S.A. 2C:44-1e. (1995).  Because the State never overcame the statutory presumption in his

case, Rebelo insists, he was never eligible for a sentence imposing imprisonment.  Accordingly,

Rebelo urges this Court to read the statutory presumption of the New Jersey code in conjunction

with the safeharbor provision of the INA, and thus to conclude that Rebelo qualifies for the

INA's safeharbor.

Rebelo's argument, while creative, is meritless.  The plain language of 8 U.S.C. §

1182(a)(2)(A)(ii)(II) provides a safeharbor only where "the maximum penalty possible" for the

crime of which the alien was convicted did not exceed a term of imprisonment of one year.  It is

beyond cavil that the crime of which Rebelo was convicted carried a *possible* sentence of up to

five years incarceration.  As it so happened, the probationary sentence actually imposed by the

Superior Court reflected that court's finding that the State had not overcome the statutory

presumption in favor of nonimprisonment.[9]  Yet, this finding is simply irrelevant to the pertinent

question of what sentence was *possible* under the statute charged.  Indeed, the Plea Form that

---

[9]  In the Judgment of Conviction, the Superior Court stated is reasons for imposing a
probationary sentence: "Since the aggravating and mitigating factors were equal, this defendant
was placed on probation."  (Decl. of Joseph R. Knuth, Ex. D at 2.)

24

Rebelo signed plainly shows a statutory maximum time of "5 yr," and in response to the

question, "Do you understand that if you plead guilty . . . [u]nless the plea agreement provides

otherwise, you could be sentenced to serve the maximum time in confinement," Rebelo circled

"Yes."  (Decl. of Joseph R. Knuth, Ex. E at 1.)  Furthermore, the Superior Court Judge, in taking

Rebelo's plea, advised Rebelo that "[y]our [sic] subject to the following maximum penalties: five

years State Prison . . . ."  (Decl. of Joseph R. Knuth, Ex. M at 4:23.)  Finally, it is undisputed that

Rebelo was convicted of a felony, and "felony" is understood in the courts of New Jersey to

mean "offenses which are punishable by more than one year in state prison."  *Serio v. Allstate*

*Ins. Co.*, 210 N.J. Super. 167, 173 n.1, 509 A.2d 273, 277 n.1 (App. Div. 1986) (citing *State v.*

*Doyle*, 42 N.J. 334, 349, 200 A.2d 606, 614 (1964)).  Thus, Rebelo does not qualify for the

safeharbor provided by 8 U.S.C. § 1182(a)(2)(A)(ii)(II).

### C.    Whether Rebelo Committed a Crime Involving Moral Turpitude

Having dispensed with Rebelo's safeharbor argument, this Court must now consider

whether Rebelo was ineligible for naturalization for having committed a "crime involving moral

turpitude," or CIMT, within the relevant period.  The INA does not define the term "crime

involving moral turpitude," evincing a Congressional intent to leave that term open to judicial

interpretation.  *Cabral v. I.N.S.*, 15 F.3d 193, 194-95 (1st Cir. 1994).  As it is typically

understood, the term connotes "conduct that is inherently base, vile, or depraved, contrary to the

accepted rules of morality and the duties owed other persons, either individually or to society in

general."  *Knapik v. Ashcroft*, 384 F.3d 84, 89 (3d Cir. 2004).  A crime against the person, to

constitute a CIMT, generally requires proof of malicious intent.  Brian C. Harms, *Redefining*

*"Crimes Against Moral Turpitude": A Proposal to Congress*, 15 Geo. Immigr. L.J. 259, 267-68

(2001).  Whether the intent is specific or general intent, however, will not be dispositive of the existence of moral turpitude.  *Sharpe v. Riley*, 271 F. Supp. 2d 631, 635 (E.D. Pa. 2003).  Moreover, a court may infer scienter in certain limited instances, such as when the unaggravated version of the offense specifies a mens rea.  *See Mei v. Ashcroft*, 393 F.3d 737, 742 (7th Cir. 2004) (implying a requirement of willfulness for aggravated fleeing from a police officer where the unaggravated version of the offense explicitly required willfulness).

Whether a given crime constitutes a CIMT is a question of law to be determined by the court.  *United States v. Chu Kong Yin*, 935 F.2d 990, 1003 (9th Cir. 1991).  Courts must base their determinations upon the statutory definition of the crime in question, as well as the record of conviction, and may not consider the nature of the act committed.  *Smriko v. Ashcroft*, 387 F.3d 279, 283 (3d Cir. 2004).

Rebelo was convicted of violating N.J.S.A. 2C:12-1b.(5)(a).  The version of that statute in effect at the time of Rebelo's offense provided as follows:

> A person is guilty of aggravated assault if he . . . [c]ommits a simple assault as defined in subsection a.(1), (2) or (3) of this section upon . . . [a]ny law enforcement officer acting in the performance of his duties while in uniform or exhibiting evidence of his authority.

N.J.S.A. 2C:12-1b.(5)(a) (1995).  Simple assault includes any assault in which the perpetrator:

> (1) Attempts to cause or purposely, knowingly or recklessly causes bodily injury to another; or
> (2) Negligently causes bodily injury to another with a deadly weapon; or
> (3) Attempts by physical menace to put another in fear of imminent serious bodily injury.

N.J.S.A. 2C:12-1a. (1995).  The third degree status of Rebelo's crime reflects a judicial finding that Officer Gramiak sustained a bodily injury.  N.J.S.A. 2C:12-1b.(6) (1995) ("Aggravated

assault . . . under subsection b.(5) is a crime of the third degree if the victim suffers bodily injury, otherwise it is a crime of the fourth degree.").

Paragraph b.(5)(a) is drafted so as to subsume the elements of paragraph a. while adding the aggravating factor that the assault was committed on a law enforcement officer.  There is no express requirement of scienter in paragraph b.(5)(a).  Paragraph 2C:2-2c.(3) of the New Jersey Statutes Annotated provides that "[a] statute defining a crime, unless clearly indicating a legislative intent to impose strict liability, should be construed as defining a crime with the culpability defined in paragraph b.(2) of this section."  N.J.S.A. 2C:2-2c.(3).  Paragraph b.(2) defines the mental state of "knowingly."  N.J.S.A. 2C:2-2b.(2).  As N.J.S.A. 2C:12-1b.(5)(a) does not clearly indicate a legislative intent to impose strict liability, that statute must be construed as requiring knowledge on the part of the accused.  The guilty plea that Rebelo entered on July 6, 1995 is plainly consistent with this construction: the Superior Court Judge asked Rebelo, "And you knew it was a police officer?," to which Rebelo responded, "Yes."  (Decl. of Joseph R. Knuth, Ex. M at 5:16-17.)

The mental state of "knowingly" does not apply to every element of the crime of aggravated assault, however.  Paragraph b.(5)(a) incorporates the elements of simple assault, found in paragraph a., which do specify mens rea.  It is blackletter law that criminal attempt requires specific intent.  *See* N.J.S.A. 2C:5-1 (defining criminal attempt); *State v. Ambroselli*, 356 N.J. Super. 377, 384, 812 A.2d 1122, 1125-26 (App. Div. 2003) ("Attempt expressly requires the culpability requirement of 'purposeful', N.J.S.A. 2C:5-1a(2) . . . .").  Accordingly, paragraphs a.(1) and (3), pertaining to attempt, require specific intent, and it has previously been held in this district that assault accompanied by specific intent constitutes a crime involving

27

moral turpitude.  *Glenside W. Corp. v. Exxon Co.*, 761 F. Supp. 1118, 1129-30 (D.N.J. 1991) (considering N.J.S.A. 2C:12-1b.(2)).  Paragraph a.(1) also admits of the possibility that the defendant acted with recklessness; however, as noted already, the distinction between specific and general intent does not control the question whether a particular offense involves moral turpitude.

Paragraph a.(2) requires only negligence on the part of the accused.  As such, this Court will treat paragraph a.(2) as defining the least offense possible under N.J.S.A. 2C:12-1b.(5)(a), and will, for purposes of this summary judgment motion, consider paragraph a.(2) to constitute the threshold for the Government's motion.  *See What Constitutes "Crime Involving Moral Turpitude" within Meaning of §§ 212(A)(9) and 241(A)(4) of Immigration and Nationality Act (8 U.S.C.A. §§ 1182(A)(9), 1251(A)(4)), and Similar Predecessor Statutes Providing for Exclusion or Deportation of Aliens Convicted of Such Crime*, 23 A.L.R. Fed. 480, § 9[b] (2004) ("[T]he determining authority must view the statutory offense at its minimum, taking into account the 'least imaginable' act it proscribes, with moral turpitude attaching to the crime only if the minimum reading of the statute necessarily reaches only offenses involving moral turpitude, without regard to the details of the misconduct.").  That paragraph also contains the aggravating elements of bodily injury and a deadly weapon.  The Third Circuit, interpreting Board of Immigration Appeals caselaw, has stated that recklessness crimes involving assault with a deadly weapon involve moral turpitude.  *Knapik*, 384 F.3d at 90; *see also In re Medina*, 15 I. & N. Dec. 611 (BIA 1976) (finding that aggravated assault was a CIMT because Illinois law required reading a mental state of intent, knowledge, or recklessness into the aggravated assault statute).  No decision of the Third Circuit, however, has addressed whether a negligence crime involving

assault with a deadly weapon, knowingly committed against a law enforcement officer in the performance of his or her duties and causing bodily injury, constitutes a crime involving moral turpitude.

To fill this void in Third Circuit caselaw, the Government urges the Court to look to *In re Danesh*, 19 I. & N. Dec. 669 (BIA 1988).  That decision of the Board of Immigration Appeals arose in the context of proceedings to deport an alien who had been convicted under a Texas statute for aggravated assault on a peace officer.  The statute in question required the following elements: "(1) the person assaulted must sustain bodily injury; (2) the accused must know that the person assaulted is a peace officer; and (3) the peace officer must be engaged in the lawful discharge of an official duty."  *Danesh*, 19 I. & N. Dec. at 673.  Like the New Jersey statute in the instant case, the Texas statute contained no express requirement of intent to cause bodily injury.  The Board of Immigration Appeals reasoned, however, that other elements of the statute served as a proxy for intent.

> The fact that bodily injury is an essential element indicates that sufficient force must have been employed to cause harm to the victim's person.  The offense is therefore properly deemed to be more serious than a simple assault.  Furthermore, the requirements that there be knowledge of the assaulted person's status as a peace officer and that the officer be discharging an official duty establish that the accused has used violence to intentionally interfere with the lawful functions of a peace officer.  Such conduct exhibits a deliberate disregard for the law, which we consider to be a violation of the accepted rules of morality and the duties owed to society.

*Id.*  Thus, the Board concluded that "an aggravated assault against a peace officer, which results in bodily harm to the victim and which involves knowledge by the offender that his force is directed to an officer who is performing an official duty, constitutes a crime that involves moral turpitude."  *Id.*

29

The same reasoning that applied in *Danesh* applies to N.J.S.A. 2C:12-1a.(2).  Rebelo argues that N.J.S.A. 2C:12-1b.(5)(a) does not require bodily injury as a necessary legal element of the crime of aggravated assault.  In making this argument, Rebelo must necessarily be referring to paragraphs a.(1) and (3), the paragraphs requiring specific intent; it is indisputable that bodily injury is a necessary element of the crime defined under paragraph a.(2).  N.J.S.A. 2C:12-1a.(2) ("A person is guilty of assault if he . . . [n]egligently causes *bodily injury* to another with a deadly weapon . . . .") (emphasis added).  As already noted, the existence of specific intent in paragraphs a.(1) and (3) is in itself sufficient to establish moral turpitude, bodily injury notwithstanding.

Yet, even as to the offenses defined in paragraphs a.(1) and (3), bodily injury is a necessary element of the crime of aggravated assault in the third degree.  *See* N.J.S.A. 2C:12-1b.(6) (1995) ("Aggravated assault . . . under subsection b.(5) is a crime of the third degree if the victim suffers bodily injury, otherwise it is a crime of the fourth degree.").  Rebelo's insistence that bodily injury is a mere sentencing factor and not a legal element rings hollow in light of New Jersey Supreme Court precedent and law enforcement practices.  In *State v. Fortin*, 178 N.J. 540, 843 A.2d 974 (2004), the New Jersey Supreme Court, reviewing federal jurisprudence on the Sixth Amendment trial by jury requirement, concluded that "functionally, the aggravating factors in [New Jersey's murder statute] are indistinguishable, for this purpose, from the elements of a crime."  *Id.* at 643, 843 A.2d at 1034.  The court continued: "Before *Apprendi* and *Ring*, New Jersey treated aggravating factors as though they were elements of the offense by submitting them to a petit jury and subjecting them to proof beyond a reasonable doubt.  Following *Ring*, today, those procedures are a constitutional imperative."  *Id.*  Not stopping there, the court

proceeded to extend its holding to encompass the right to a grand jury presentation provided in Article 1, Paragraph 8 of the Constitution of the State of New Jersey. *Id.* at 645-46, 843 A.2d at 1035 ("We, therefore, hold that our State Constitution requires that aggravating factors be submitted to the grand jury and returned in an indictment.").  Paragraph 8 of Article 1 provides that "No person shall be held to answer for a criminal offense, unless on the presentment or indictment of a grand jury . . . or in cases now prosecuted without indictment . . . ."  N.J. Const. Art. 1, par. 8.  By Rebelo's own admission, the Union County Prosecutor "insisted on a plea to an indictable offense."  (Def.'s Statement Pursuant to L. Civ. R. 56.1., ¶ 20.)  Thus, under New Jersey practice, held to be constitutionally mandated by *Fortin*, the aggravating factor of "bodily injury" would have been submitted to a grand jury for Rebelo to be indicted for the crime of aggravated assault in the third degree pursuant to N.J.S.A. 2C:12-1.(b)(5).  Following the New Jersey Supreme Court's guidance, this Court concludes that "bodily injury" is, for all practical purposes, a legal element of Rebelo's crime.  *See also Helmy v. City of Jersey City*, 178 N.J. 183, 188, 836 A.2d 802, 804 (2003) (noting that the defendant "was indicted on four counts of third degree aggravated assault against Officers Collier and Moffit by attempting to cause them 'bodily injury' in violation of N.J.S.A. 2C:12-1b(5)(a)").

Rebelo nevertheless argues that the crime for which he was convicted was in reality nothing more than a simple assault.  While conceding that he was convicted of one count of "aggravated assault" in the third degree, Rebelo contends that his crime was an aggravated assault only by virtue of the status of the person assaulted, i.e., a "law enforcement officer," and "not from any additional requirement of intent, serious injury, or use of a deadly weapon." (Def.'s Br. in Opp'n to Government's Mot. for Summ. J. at 13.)  This Court disagrees.  It defies

31

contradiction that Rebelo pled guilty to, and was convicted of, aggravated assault in the third degree pursuant to N.J.S.A. 2C:12-1b. Subsection b.(5) of that statutory provision plainly defines an offense of "aggravated assault," notwithstanding that this definition subsumes the elements of simple assault as set forth under subsection a. The State of New Jersey has determined that a simple assault on a law enforcement officer acting in the performance of his or her duties while in uniform or exhibiting evidence of authority merits classification and punishment as an aggravated assault. It is not for this Court to second-guess the wisdom of this decision.

The New Jersey statute also requires that the accused have knowledge that the person assaulted was a law enforcement officer. Rebelo insists that the New Jersey assault statute contains no requirement that the accused know that his victim is a police officer, but in making this argument he overlooks N.J.S.A. 2C:2-2c.(3). As noted already, this provision operates to apply a culpability requirement of "knowingly" to N.J.S.A. 2C:12-1b.(5)(a), which is otherwise silent as to the required mental state. Moreover, Rebelo pleaded before the Superior Court to having knowledge that the person assaulted was a police officer. *See Smriko*, 387 F.3d at 283 (permitting courts to look to the record of conviction, in addition to statutory language, in determining whether a crime involves moral turpitude). Accordingly, the instant statute is congruent to the Texas statute in *Danesh* in respect to the requirement that the accused have knowledge of the assaulted person's status as a law enforcement officer. *See State ex rel. S.B.*, 333 N.J. Super. 236, 245, 755 A.D.2d 596, 600-01 (App. Div. 2000) ("[T]o constitute an aggravated assault upon a law enforcement officer, contrary to N.J.S.A. 2C:12-1(b)(5)(A), the State must prove, beyond a reasonable doubt, in addition to the other elements of the offense, that

defendant knew the victim was a law enforcement officer acting in the performance of his duties while in uniform or exhibiting evidence of his authority. ").

Rebelo distinguishes New Jersey's statute from that in *Danesh* on the ground that the New Jersey statute permits a person to be found guilty of aggravated assault on a law enforcement officer even if the law enforcement officer had been effectuating an unlawful arrest at the time of the assault. *See State v. Casimono*, 250 N.J. Super. 173, 182-85, 593 A.2d 827, 832-33 (App. Div. 1991). This distinction, however, is unavailing. It is a firmly-rooted principle of New Jersey law that "a private citizen may not use force to resist arrest by one he knows or has good reason to believe is an authorized police officer engaged in the performance of his duties, whether or not the arrest is illegal under the circumstances obtaining." *State v. Koonce*, 89 N.J. Super. 169, 184, 214 A.2d 428, 436 (App. Div. 1965). That an arrest may be illegal does not excuse or mitigate an assault committed on the arresting officer. *See State v. De Grote*, 136 N.J. Super. 525, 530, 347 A.2d 23, 25 (Law Div. 1975) ("New Jersey does not follow the common law which permits one to use force to resist an illegal arrest."). Thus, so long as the person arrested knew that the individual effectuating the arrest was an authorized police officer engaged in the performance of his or her duties, New Jersey courts will make no further inquiry into the lawfulness of the arrest.[10] The distinction that Rebelo highlights between the New Jersey statute in the instant case and the Texas statute in *Danesh* is a distinction that New Jersey courts themselves do not credit for purposes of determining culpability for aggravated assault.

---

[10] New Jersey courts do permit a limited exception where an arresting officer uses excessive and unnecessary force in effectuating an arrest. *See State v. Mulvihill*, 57 N.J. 151, 158, 270 A.2d 277, 280-81 (1970). Because the New Jersey Superior Court found no use of excessive and unnecessary force in Rebelo's arrest, this Court need not consider this defense for purposes of the instant action.

Moreover, the Board of Immigration Appeals apparently did not consider this element of the Texas statute to be dispositive, as the Board dropped the "lawfulness" requirement from the final expression of its holding. *See Danesh*, 19 I. & N. Dec. at 673 ("[W]e conclude that an aggravated assault against a peace officer, which results in bodily harm to the victim and which involves knowledge by the offender that his force is directed to an officer who is performing an official duty, constitutes a crime that involves moral turpitude."); *see also id.* at 672 (making no reference to lawfulness of arrest as a factor to be considered in determining whether moral turpitude is involved in an assault). Accordingly, this Court concludes that even if N.J.S.A. 2C:12-1b.(5)(a) permits a conviction for aggravated assault to obtain where an arrest was effectuated unlawfully, that fact in itself does not undermine the persuasive authority of *Danesh*.

Rebelo's efforts to distinguish the statute in *Danesh* from N.J.S.A. 2C:12-1a.(2) tellingly omit the greatest distinction, however: the New Jersey statute, unlike that in *Danesh*, requires the assault to have been committed with a deadly weapon. It has been held that aggravated assault with a deadly weapon is "inherently base" and constitutes a crime involving moral turpitude, even where no criminal intent is specified in the underlying statute. *In re O—*, 3 I. & N. Dec. 193, 197-98 (BIA 1948). Indeed, the Board of Immigration Appeals has written that "[t]here would appear to be little or no difference, . . . from the standpoint of moral turpitude, between an assault with intent to do a great bodily harm, and assault with a deadly and/or dangerous weapon." *Id.* at 197 (citations omitted). This authority would therefore suggest that whereas *Danesh* found moral turpitude in a Texas statute prohibiting an assault that causes bodily injury on a person who is known to be a peace officer performing an official duty, N.J.S.A 2C:12-1a.(2), which adds the requirement of a deadly weapon, is *a fortiori* a crime involving moral

34

turpitude.

In light of the foregoing analysis, this Court concludes that *Danesh* is strong persuasive authority for the proposition that one who negligently causes bodily injury to another with a deadly weapon pursuant to N.J.S.A. 2C:12-1a.(2), where the person assaulted was known by the accused to be a law enforcement officer acting in the performance of his or her duties while in uniform or exhibiting evidence of authority, commits a crime involving moral turpitude. Although decisions of the Board of Immigration Appeals are not binding on this Court, the Third Circuit has recently approved of the definition of "moral turpitude" recited in *Danesh*. *See Knapik*, 384 F.3d at 89. Accordingly, in the absence of controlling caselaw to the contrary, this Court adopts the compelling analysis set forth in *Danesh* and concludes that an aggravated assault encompassing the elements set forth in N.J.S.A. 2C:12-1a.(2) is a crime involving moral turpitude. By extension, this Court holds that a conviction of aggravated assault pursuant to N.J.S.A. 2C:12-1b.(5)(a) is a conviction of a crime involving moral turpitude for purposes of 8 U.S.C. § 1182(a)(2).

It is undisputed that Rebelo was convicted of violating N.J.S.A. 2C:12-1b.(5)(a). Commensurate with this Court's holding today, the Court finds that Rebelo was convicted of a crime involving moral turpitude within the meaning of 8 U.S.C. § 1182(a)(2)(a)(i)(I). This Court is therefore compelled to find, pursuant to Section 101(f)(3) of the INA, 8 U.S.C. § 1101(f)(3), that Rebelo was not a "person of good moral character" during the period for which good moral character was required to be established, i.e., the five years immediately preceding the filing of his Application. 8 U.S.C. § 1427(a)(3). As such, Rebelo was ineligible for naturalization on July 5, 1995, when he filed his Application with the INS, on October 31, 1995, when the INS

approved his Application, and on December 7, 1995, when Rebelo took his oath of allegiance

and the INS issued Certificate of Naturalization No. 21 797 328.  *See* 8 U.S.C. § 1427(a)(3).

Upon so finding, this Court lacks equitable discretion to refuse to enter an order of

denaturalization.  *Fedorenko v. United States*, 449 U.S. 490, 517 (1981) ("[D]istrict courts lack

equitable discretion to refrain from entering a judgment of denaturalization against a naturalized

citizen whose citizenship was procured illegally or by willful misrepresentation of material

facts.").  The Government has carried its initial burden of production and its burden of proof.

Rebelo has failed to establish the existence of a genuine issue of material fact requiring

resolution at trial.  Accordingly, the Government is entitled to judgment as a matter of law.

## III.    Conclusion

It is therefore ORDERED that the Government's motion for summary judgment is

GRANTED on the ground that Marco Paulo Rebelo was convicted of a crime involving moral

turpitude during the statutory period.  Pursuant to 8 U.S.C. § 1451(a), the order admitting Marco

Paulo Rebelo to citizenship is REVOKED, and Certificate of Naturalization No. 21 797 328 is

CANCELLED.  Rebelo's cross-motion for summary judgment is DENIED.


Newark, New Jersey                                    s/ Harold A. Ackerman, U.S.D.J.
Dated: March 3, 2005