FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Hon. Garrett E. Brown, Jr. |
|  | ) |  |
| Plaintiff, | ) | Civil Action No. 01-2120 |
|  | ) |  |
| v. | ) | **MEMORANDUM OPINION** |
|  | ) |  |
| MARCO PAULO REBELO, | ) |  |
|  | ) |  |
| Defendant. | ) |  |

Erik Robert Quick, Esq.
Office of Immigration Litigation
U.S. Department of Justice
P.O. Box 868
Ben Franklin Station
Washington, D.C.  20044
*Attorneys for Plaintiff*

Thomas E. Moseley, Esq.
THE LAW OFFICE OF TOM MOSELEY
One Gateway Center — Suite 2600
Newark, New Jersey 07102
*Attorneys for Defendant*

### BROWN, Chief Judge:

This matter, in the nature of a denaturalization proceeding, comes before the Court on the

reinstated cross-motions (Doc. Nos. 20, 21) for summary judgment filed by Plaintiff the United

States of America (hereinafter "the Government") and Defendant Marco Paulo Rebelo.  For the

following reasons, the Court will grant the Government's motion for summary judgment.

Consequently, the Court will revoke Defendant's order of naturalization and cancel his certificate

of naturalization.

## I.    BACKGROUND

The Government brings this action to revoke Defendant's order of naturalization and to cancel his certificate of naturalization pursuant to section 340(a) of the Immigration and Naturalization Act (INA), 8 U.S.C. § 1451(a) (2000). The Honorable Harold A. Ackerman initially granted summary judgment in favor of the Government on March 3, 2005. *United States v. Rebelo*, 358 F. Supp. 2d 400, 421 (D.N.J. 2005). The matter returns to the Court pursuant to the May 9, 2006 consent order (Doc. No. 26) issued by the United States Court of Appeals for the Third Circuit instructing this Court to reconsider the March 3, 2005 denaturalization order in light of the Third Circuit's subsequent decision in *Partyka v. Attorney General*, 417 F.3d 408 (3d Cir. 2005).[1] Before embarking on this task, it is incumbent upon the Court to revisit the factual and procedural history of this dispute.

### A. Factual and Procedural History

As a young boy, Rebelo immigrated with his family to the United States on January 26, 1981. Though a native of Rhodesia (now Zimbabwe), Rebelo came to this country as a Portuguese citizen. Rebelo and his family settled in Elizabeth, New Jersey, where Rebelo attended public school until he dropped out in the twelfth grade. Thereafter, Rebelo began a diesel engineering program, though he eventually quit the program to work as an autobody repairman and mechanic.

The event precipitating this denaturalization proceeding occurred on the morning of May 14, 1995. At the time, Rebelo lived with his parents at 22 Summer Street in Elizabeth, New Jersey. A friend notified Rebelo that his younger brother Fernando had been arrested

---

[1]By order of August 10, 2009, the instant matter was reassigned to this Court.

approximately one block from the family home, prompting Rebelo and his father to visit the scene of the arrest. Once there, they discovered that Fernando was detained in the back seat of a police car, and that portions of his clothing were ripped.

A heated argument ensued between Rebelo and his father, on one side, and the police officers. Though the parties dispute what caused the fracas (*see generally* Montana Decl., Ex. N (Request for Admissions), Section I, Ex. D (Police Reports); Moseley Decl., Ex. A (Dep. of Marco P. Rebelo, Oct. 7, 2003) at 32–35), it is undisputed that Officer Gramiak attempted to place Rebelo under arrest, and that Rebelo bit Officer Gramiak's bare forearm during the ensuing struggle.[2] Rebelo would eventually be charged with two counts of aggravated assault on a police officer, two counts of resisting arrest, one count of obstructing the administration of law, and one count of making terroristic threats. (Pl.'s L. Civ. R. 56.1 Statement at 4–5; Police Reports at 8; Request for Admissions, Section I, Ex. G (Plea Form) ¶ 12.)

Rebelo, his father, and his brother were all detained following the May 14, 1995 incident. While the charges against Rebelo's brother and father were reduced to a reckless driving ticket and disorderly persons offense, respectively, Rebelo's case proceeded in Union County Superior Court. While out on bail with charges pending, on June 11, 1995, Rebelo signed an Application for Naturalization, INS Form N-400 ("Application") under penalty of perjury. By signing the Application, Rebelo affirmed that all statements made in response to questions on the Application were true and correct. Question 15 of Part 7 of the Application asked the following criminal history question: "Have you ever . . . been arrested, cited, charged, indicted, convicted,

---

[2]The police reports indicate that Officer Gramiak sustained substantial injuries from the bite wound, and that he and Rebelo both received hospital treatment for injuries stemming from the arrest. (Police Reports at 7.)

3

fined or imprisoned for breaking or violating any law or ordinance excluding traffic regulations?" (Request for Admissions, Section I, Ex. B (Application) at 3.)  Rebelo responded to the question in the affirmative, necessitating the inclusion of a supplement to explain the nature of the misconduct.  The following hand-written statement comprised the entirety of Rebelo's criminal history supplement: "Supplement to #15, Elizabeth, N.J., Marco P. Rebelo, May 14, 1995, Disorderly Persons Offense, Charges Dismissed."  Rebelo admits that he attached this statement to the Application (Request for Admissions, Section II ¶ 5) and that the statement represents the advice of the family attorney, but denies that he wrote the statement, does not recall reading the statement, and has no knowledge of who prepared the statement (*see* Dep. of Marco P. Rebelo, Oct. 7, 2003 at 90–95).  As Judge Ackerman previously observed, "It is undisputed that the information provided in the supplement was neither truthful at the time Rebelo signed the Application nor at any time thereafter." *Rebelo*, 358 F. Supp. 2d at 405.

Rebelo filed his Application with the Immigration and Naturalization Service (INS)[3] on July 5, 1995, the day before the scheduled hearing for his criminal proceeding in Superior Court. As of this date, Rebelo remained on bail with six charges pending against him in Superior Court, including two counts of aggravated assault on a police officer.

The following day Rebelo appeared in Superior Court, where he entered a guilty plea pursuant to a plea agreement and was convicted of third degree aggravated assault of a police officer in violation of N.J. Stat. Ann. § 2C:12-1b(5)(a), a felony offense.  Notwithstanding a statutory sentencing range of three to five years of incarceration, *see* N.J. Stat. Ann. § 2C:43-6a(3), the Superior Court sentenced Rebelo to two years of probation, which Rebelo served from

---

[3]The INS was the forbear of the U.S. Citizenship and Immigration Services (CIS).

4

September 8, 1995 through July 14, 1997 (Request for Admissions, Section II ¶¶ 14–17).

Relying on Rebelo's sworn statements, the INS approved Rebelo's Application on October 31, 1995, and Rebelo took the oath of allegiance on December 7, 1995, whereupon he received Certificate of Naturalization No. 21 797 328. (Parra Decl. ¶¶ 8–9; Request for Admissions, Section I, Ex. A; *id.* Section II ¶ 18.) It is undisputed that Rebelo was on criminal probation when he took the oath of allegiance. (Request for Admissions, Section II ¶¶ 14–18; *see also* Knuth Decl., Ex. L (Probation Record).) At no point prior to his naturalization did Rebelo inform the INS of the disposition of the criminal charges against him.

Nearly two years later, the INS discovered the extent of Rebelo's criminal history and issued a Notice of Intent to Revoke naturalization on November 4, 1997. Specifically citing Rebelo's response to Application Question 15—which indicated a dismissed disorderly persons charge as opposed to the aggravated assault charge for which he was ultimately convicted and sentenced to two years of probation—the INS sought to rescind Rebelo's naturalization pursuant to section 340(a) of the INA, 8 U.S.C. § 1451(a), as (i) barred by his commission of a crime involving moral turpitude, as well as his probation status at the time of naturalization, and (ii) wrongfully procured by willful misrepresentation or concealment of a material fact. (Montana Decl., Ex. U at 2.)

Thereafter, the INS initiated administrative denaturalization proceedings against Rebelo, but the proceedings were stayed during the pendency of lawsuits challenging the legality of administrative denaturalization proceedings. After the United States Court of Appeals for the Ninth Circuit confined denaturalization proceedings to civil actions in United States District Courts, *see Gorbach v. Reno*, 219 F.3d 1087, 1099 (9th Cir. 2000) (en banc), on May 2, 2001, the

5

Government filed the instant action against Rebelo.

This Court granted the Government's motion for summary judgment on March 3, 2005. Judge Ackerman premised summary judgment and the consequent denaturalization order upon his finding that Rebelo's conviction for third-degree aggravated assault of a police officer under N.J. Stat. Ann. § 2C:12-1b(5)(a) constituted a crime involving moral turpitude that rendered Rebelo ineligible for naturalization under federal law. *Rebelo*, 358 F. Supp. 2d at 420. Because the New Jersey aggravated assault statute provided for three varieties of qualifying conduct and mental states,[4] the Court based its analysis on the presumption that Rebelo's misconduct involved the least culpable mental state: negligence. *Rebelo*, 358 F. Supp. 2d at 416–17 ("[T]his Court will treat paragraph a.(2) as defining the least offense possible under N.J.S.A. [§] 2C:12-1b(5)(a), and will, for purposes of this summary judgment motion, consider paragraph a.(2) to constitute the threshold for the Government's motion.") (citation omitted). On the basis of this assumption, the Court construed Rebelo's conduct to entail "[n]egligently caus[ing] bodily injury to another with a deadly weapon," pursuant to N.J. Stat. Ann. § 2C:12-1a(2). *Rebelo*, 358 F. Supp. 2d at 416–17. Before reaching the merits of the Government's arguments, Judge Ackerman rejected the following contentions raised by Rebelo's cross-motion: (1) that the

---

[4]Section 2C:12-1a of the New Jersey Statutes Annotated, by application of § 2C:12-1b(5)(a), defined aggravated assault of a police officer to include the following conduct:

(1)   Attempts to cause or purposely, knowingly or recklessly causes bodily injury to another; or
(2)   Negligently causes bodily injury to another with a deadly weapon; or
(3)   Attempts by physical menace to put another in fear of imminent serious bodily injury.

N.J. Stat. Ann. § 2C:12-1a (1995).

6

Government's denaturalization action was time-barred by 28 U.S.C. § 2462, the "federal catch-all statute of limitations"; (2) that Rebelo had properly pled his asserted equitable defenses, which included, *inter alia*, estoppel, laches, waiver, and unclean hands; and (3) that Rebelo qualified for the safe harbor afforded by section 212(a)(2) of the INA, 8 U.S.C. § 1182(a)(2). *Rebelo*, 358 F. Supp. 2d at 408–15 (hereinafter "Rebelo's defenses").

### B. Arguments on Remand

On remand, the Government advances the same grounds for denaturalization that it presented in the original motion: (1) that Rebelo's state-law conviction constituted a crime involving moral turpitude that rendered him ineligible for naturalization pursuant to sections 101(f)(3) and 212(a)(2)(A) of the INA, 8 U.S.C. §§ 1101(f)(3), 1182(a)(2)(A)(i); (2) that Rebelo's criminal probation status at the time of application barred naturalization pursuant to 8 C.F.R. § 316.10(c)(1) (hereinafter "probation regulation"); and (3) that Rebelo wrongfully procured naturalization under section 340(a) of the INA, 8 U.S.C. § 1451(a), by willfully misrepresenting and concealing material facts related to his criminal history on his naturalization application. The Government asserts that Rebelo's criminal conduct differs from the conduct found not morally turpitudinous in *Partyka*. Meanwhile, the Government contends that the law of the case disposes of Defendant's reinstated cross-motion.

Rebelo counters the Government's theories as follows: (1) *Partyka* compels the conclusion that his state-law conviction did not implicate moral turpitude; (2) the INS's failure to comply with the "notice and comment" requirements of the Administrative Procedure Act (APA), 5 U.S.C. § 553, nullifies the probation regulation; and (3) the misstatement made on his naturalization application is excusable because (i) his reliance on his attorney's advice negates

7

willfulness, and (ii) the misrepresentation did not concern matters of material fact.

## II.   SCOPE OF THE *PARTYKA* REMAND

Having reviewed the factual and procedural history, the Court now turns its attention to

the scope of the *Partyka* remand.  It is well-established that trial courts acting on remand should

confine their review to the appellate court's mandate.  *E.g., Skretvedt v. E.I. DuPont De*

*Nemours*, 372 F.3d 193, 203 n.13 (3d Cir. 2004); *Ratay v. Lincoln Nat'l Life Ins. Co.*, 405 F.2d

286, 288 (3d Cir. 1968).  As "a species of the law of the case doctrine," the mandate rule bars

trial courts from re-examining prior conclusions of law left untouched by the appellate court's

mandate, but a silent mandate does not foreclose review of alternative arguments previously

presented but not ruled upon.  *See Skretvedt*, 372 F.3d at 203 n.13; *In re Resyn Corp.*, 945 F.2d

1279, 1281–82 (3d Cir. 1991).  The law of the case doctrine, meanwhile, instructs courts to

adhere to decisions of law, once made, throughout the course of a case in the absence of

"extraordinary circumstances." *See, e.g., In re City of Phila. Litig.*, 158 F.3d 711, 718 (3d Cir.

1998); *United States v. Kikimura*, 947 F.2d 72, 77 (3d Cir. 1991).

*United States v. Partyka* involved the removal proceedings of a Polish immigrant who,

like Rebelo, pled quilty and was convicted of one count of third-degree aggravated assault on a

police officer, in violation of N.J. Stat. Ann. § 2C:12-1b(5)(a).  The offense stemmed from a

domestic dispute, wherein Partyka sustained substantial injuries from a K-9 police dog; Partyka

physically resisted restraint, but the detaining police officers ostensibly suffered no injuries. *See*

*Partyka*, 417 F.3d at 410.  The Immigration Judge deemed Partyka removable on the basis that

his offense involved moral turpitude, and the Board of Immigration Appeals (BIA) affirmed. *See*

*id.* at 409–10.

8

On direct appeal, the Third Circuit vacated the BIA's final order of removal, finding that Partyka had not committed a crime involving moral turpitude. *Id.* at 416–17. In doing so, the *Partyka* court specifically disagreed with this Court's conclusion that the least culpable conduct under N.J. Stat. Ann. § 2C:12-1b(5)(a)—negligently causing bodily injury with a deadly weapon, N.J. Stat. Ann. § 2C:12-1a(2)—involved moral turpitude. *Partyka,* 417 F.3d at 416 & n.6. Thus, the Third Circuit reasoned, unless Partyka's record of conviction demonstrated "that he was convicted for violating a subsection of the statute requiring intentional, knowing, or reckless infliction of bodily injury," the court would presume Partyka was convicted for negligently causing bodily injury with a deadly weapon, a non-turpitudinous crime. *Id.* at 416; *see generally supra* note 4 (presenting the three variants of assault applicable to a conviction under N.J. Stat. Ann. § 2C:12-1b(5)(a)).

The Third Circuit constrained its review of the record of conviction to the indictment, judgment of conviction, the criminal sentence, and the accompanying statement of the reasons for the sentence. *Partyka*, 417 F.3d at 416. Finding no indication that Partyka was convicted of an intentional, knowing, or reckless assault, the court assessed Partyka's misconduct as non-turpitudinous negligent assault. *Id.* The absence of evidence that Partyka's crime involved a deadly weapon did not deter the court from making the least-culpable-conduct presumption that he negligently inflicted bodily harm with a deadly weapon under N.J. Stat. Ann. § 2C:2-1a(2). *See Partyka*, 417 F.3d at 413 ("We need not concern ourselves with the statutory definition of a deadly weapon because Partyka had no weapon in his possession.").

*Partyka* thus displaces the basis for this Court's denaturalization order—Judge Ackerman's conclusion that negligent assault with a deadly weapon under N.J. Stat. Ann.

9

§ 2C:12-1a(2) constituted a crime involving moral turpitude. However, Judge Ackerman did not determine as a matter of law that Rebelo was *convicted* of negligent assault with a deadly weapon; rather, it is apparent that Judge Ackerman bypassed determining whether the record of conviction detailed a more culpable form of assault, opting instead to begin his analysis on the assault statute's least culpable conduct. *See Rebelo*, 358 F. Supp. 2d at 416–17 (citing 23 A.L.R. Fed. 480, § 9[b] (2004) for the proposition that "the determining authority must view the statutory offense at its minimum, . . . with moral turpitude attaching to the crime only if the minimum reading of the statute necessarily reaches only offenses involving moral turpitude, without regard to the details of the misconduct"). Indeed, the Third Circuit's review of Partyka's record of conviction for evidence that he had been convicted of more culpable misconduct suggests that such review is implicit in the *Partyka* remand. Accordingly, neither the mandate rule nor the law of the case doctrine prevent this Court on remand from reviewing Rebelo's record of conviction for evidence that he was convicted of a more culpable crime. The Court will entertain the Government's primary contention that Rebelo was convicted of a crime involving moral turpitude.

Likewise, neither the mandate rule nor the law of the case doctrine bar consideration of the Government's alternative grounds for denaturalization premised on the probation regulation and the false statements appearing in Rebelo's naturalization application. *Partyka* did not involve these discrete issues, and Judge Ackerman did not rule on them. Accordingly, the Court will consider these arguments.

However, the mandate rule and the law of the case do stand in the way of Defendant's cross-motion defenses. As noted above, Judge Ackerman rejected Rebelo's cross-motion

10

defenses related to the federal catch-all statute of limitations, the INA safe harbor provision, and the equitable doctrines of estoppel, laches, waiver, and unclean hands. *Rebelo*, 358 F. Supp. 2d at 408–15. *Partyka* did not address any of these issues, and Rebelo does not present any reasons why this Court should review Judge Ackerman's rulings on those matters. Therefore, in light of the limited nature of the *Partyka* remand, and in the absence of "extraordinary circumstances" warranting reconsideration of the law of the case, *see In re City of Phila. Litig.*, 158 F.3d at 718, this Court has no occasion to revisit those rulings.

### III.   ANALYSIS

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is warranted when the moving party demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Indeed, summary judgment will only be granted if the movant shows that "there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." *Miller v. Ind. Hosp.*, 843 F.2d 139, 143 (3d Cir.), *cert. denied*, 488 U.S. 870 (1988). Thus, an issue is considered "genuine" if a reasonable jury could hold in the nonmovant's favor with regard to that issue. *See Anderson*, 477 U.S. at 247–48. Meanwhile, a fact is "material" if it influences the outcome under the governing law. *Id.* at 248; *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985).

The Government, as movant, bears the initial burden of production. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In a denaturalization proceeding such as the instant case, the Government bears a particularly heavy burden of proof. *Fedorenko v. United States*, 449 U.S. 490, 505 (1981); *United States v. Breyer*, 41 F.3d 884, 889 (3d Cir. 1994). "The evidence

11

justifying revocation of citizenship must be 'clear, unequivocal, and convincing' and not leave

'the issue in doubt.'" *Fedorenko*, 449 U.S. at 505 (quoting *Schneiderman v. United States*, 320

U.S. 118, 125 (1943); *Maxwell Land-Grant Case*, 121 U.S. 325, 381 (1887)). "Any less exacting

standard would be inconsistent with the importance of the right that is at stake in a

denaturalization proceeding." *Fedorenko*, 449 U.S. at 505.

      Once the Government has met its initial burden, the burden of production shifts to

Rebelo, who must then present evidence establishing the existence of a genuine issue of material

fact requiring resolution at trial. *United States v. Reve*, 241 F. Supp. 2d 470, 475 (D.N.J. 2003).

While his evidence need not be admissible at trial, *see Celotex*, 477 U.S. at 324, it must be actual

evidence, beyond mere allegations, that establishes a genuine issue of material fact, *Reve*, 241 F.

Supp. 2d at 475. In considering this motion, the Court must view all evidence and related

inferences in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 587 (1986). In other words, this Court cannot resolve factual

disputes or make credibility determinations at the summary judgment stage. *Big Apple BMW,*

*Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

      The Government brings this denaturalization proceeding pursuant to section 340 of the

INA, 8 U.S.C. § 1451(a), which permits revocation of naturalization when it has "[been] illegally

procured or . . . procured by concealment of a material fact or by willful misrepresentation[.]"

Illegal procurement occurs when an individual ineligible for naturalization under federal law

nonetheless manages to naturalize. *Federenko*, 449 U.S. at 506 ("Our cases have also recognized

that there must be strict compliance with all the congressionally imposed prerequisites to the

acquisition of citizenship. Failure to comply with any of these conditions renders the certificate

of citizenship 'illegally procured,' and naturalization that is unlawfully procured can be set aside.") (citations omitted); *see also United States v. Kiang*, 175 F. Supp. 2d 942, 949 (E.D. Mich. 2001) (defining illegal procurement to include non-compliance with regulatory restrictions on citizenship), *aff'd*, 56 F. App'x 696, 698 (6th Cir. 2003) (per curiam). Wrongful procurement occurs when an applicant for citizenship willfully misrepresents or conceals a material fact, and the misrepresentation results in the applicant's successful naturalization. *Kungys v. United States*, 485 U.S. 759, 767 (1988). Denaturalization, if granted, renders the naturalization *void ab initio*. 8 U.S.C. § 1451(a) (providing that revocation of naturalization and cancellation of the certificate "shall be effective as of the original date of the order and certificate, respectively"). This Court has jurisdiction pursuant to 8 U.S.C. § 1451 and 28 U.S.C. § 1345.

The Government presents three grounds for denaturalization: (1) that Rebelo's state-law conviction entailed moral turpitude, rendering him ineligible for naturalization under sections 101(f)(3) and 212(a)(2)(A) of the INA; (2) that the probation regulation, 8 C.F.R. § 316.10(c)(1), barred Rebelo from naturalizing while he was on probation; and (3) that Rebelo wrongfully procured naturalization under section 340(a) of the INA by willfully misrepresenting and concealing material facts related to his criminal history on his Application. While Rebelo's scant record of conviction, when viewed through the lens of *Partyka*, does not permit a finding of moral turpitude, the Court agrees that Rebelo illegally procured naturalization in violation of the probation regulation and wrongfully procured the same by willful misrepresentation and concealment of material facts on his Application.

### A. *Crime Involving Moral Turpitude*

Following in the path of *Partyka*, the Court turns to Rebelo's record of conviction. The Government argues that, although Rebelo was nominally convicted of the same crime as Partyka—third degree aggravated assault, in violation of N.J. Stat. Ann. § 2C:12-1b(5)(a)—the record makes clear that Rebelo committed a more culpable assault, consisting of an *attempt* to cause bodily injury under N.J. Stat. Ann. § 2C:12-1a(1). *See generally supra* note 4. If this were true, then Rebelo's conviction would appear to satisfy the *Partyka* test for a crime involving moral turpitude. *See Partyka*, 417 F.3d 413 n.3 (citing with approval Judge Ackerman's observation that the assault described in subsections a(1) and a(3) required specific intent), 416 (proceeding to consider whether the record of conviction indicated that Partyka was convicted of violating subsections a(1) and a(3)). Alas, Rebelo's record of conviction is anything but clear.

To support its claim that Rebelo attempted to cause bodily injury, the Government points to the criminal complaint filed against Rebelo in Superior Court. Indeed, the criminal complaint & warrant indicates that Rebelo did "attempt to cause bodily injury to officer, Gramiak [sic], a law enforcement officer . . . in violation of N.J.S. 2C:12-1b(5a)." (Pl.'s L. Civ. R. 56.1 Statement at 4; Knuth Decl., Ex. J (Complaint).) Thus, the complaint language clearly classified Rebelo's assault as one arising under N.J. Stat. Ann. § 2C:12-1a(1). Yet neither the waiver of indictment, the prosecutor's accusation, the plea agreement, the plea transcript, nor the judgment of conviction provide any indication of which type of assault Rebelo committed. (*See* Request for Admissions, Section I, Ex. E (Waiver of Indictment), F (Accusation), G (Plea Agreement), I (Judgment of Conviction); Knuth Decl., Ex. M (Plea Transcript).) The closest any of these comes to specifying the genus of Rebelo's assault is the accusation, which appears to incorporate

14

the complaint by reference.[5]   Nevertheless, the charging language of the accusation merely states

that Rebelo "did commit an assault on Officer Gramiak . . . in violation of N.J.S.A. 2C:12-

1b(5)(a)." (Accusation.)  Thus, this Court must decide whether it can consider the complaint as

part of Rebelo's record of conviction.

The record of conviction consists of the charging instrument, the judgment of conviction,

the criminal sentence, and any statement of the reasons for the sentence. *Partyka*, 417 F.3d at

416.  In *Garcia v. Attorney General of the United States*, the Third Circuit explained that the

record of conviction could include a criminal complaint if the criminal complaint functioned as

the charging instrument.  462 F.3d 287, 293 (3d Cir. 2006) (explaining that complaint against

Garcia operated as the charging instrument under Pennsylvania law).  However, the *Garcia* rule

does not apply to the complaint against Rebelo, which was issued pursuant to New Jersey law.

Although New Jersey courts have characterized a criminal complaint as a charging instrument,

*see, e.g.*, *State v. Salzman*, 228 N.J. Super. 109, 114 (App. Div. 1987), New Jersey law

differentiates between complaints and other charging instruments such as indictments and

accusations, *compare* N.J. Court Rules 3:2 ("Content of Complaint") *and* 3:3 ("Summons or

Warrant upon Complaint") *with* 3:7 ("Indictment").  Moreover, even if New Jersey law permitted

a complaint to operate as a charging instrument, it is evident in this case that it was the

prosecutor's accusation, the document upon which Rebelo pled guilty, and not the complaint,

that served as the charging instrument. *Cf. Garcia*, 462 F.3d at 292 ("[The complaint] is the

---

[5]The accusation states that Rebelo "ha[d] been charged upon oath . . . with the above
charge," and appears to identify the charge as "C.D.R. No. W1995-003439-2004." (*See*
Accusation).  This charge number appears to match the charge number of the complaint, but the
copy of the complaint submitted to the Court does not clearly reveal the entire charge number for
this charge. (*See* Complaint.)

charging instrument, and in this case bears the imprimatur of the district attorney. The filing of a criminal complaint is sufficient to initiate criminal proceedings in the Commonwealth and Pennsylvania law does not require the subsequent filing of either an information or an indictment if a plea of guilty or nolo contendere is entered.") (citations omitted). Consequently, the Court cannot consider the complaint as part of Rebelo's record of conviction.

Although the Court would be inclined to find that the evidence of Rebelo's *conduct* suggests a more culpable assault, such evidence cannot overcome the silence of the record of conviction. As noted above, Rebelo's record of conviction—the accusation, judgment of conviction, and sentence—does not specify what type of assault he committed. Thus, this Court must adhere to *Partyka*'s least-culpable-conduct presumption and conclude that Rebelo committed negligent assault with a deadly weapon under N.J. Stat. 2C:12-1a(2).[6] Such misconduct does not constitute a crime involving moral turpitude. *Partyka*, 417 F.3d at 416. For these reasons, the Court will deny summary judgment on this ground.

B. *Probation Regulation, 8 C.F.R. § 316.10(c)(1)*

The probation regulation provides in pertinent part:

An applicant [for naturalization] who has been on probation, parole, or suspended sentence during all or part of the statutory period is not thereby precluded from establishing good moral character, but such probation, parole, or suspended sentence may be considered by the Service in determining good moral character. An application will not be approved until after the probation, parole, or suspended sentence has been completed.

8 C.F.R. § 316.10(c)(1). The rule thus bars the naturalization of applicants who remain on

---

[6]As in *Partyka*, the absence of evidence that Defendant used a weapon during the commission of the offense has no bearing in the least-culpable-conduct presumption. *See Partyka*, 417 F.3d at 413.

probation at the end of the statutory review period, during which time the applicant must demonstrate his or her good moral character. *See* 8 U.S.C. § 1427(a)(3) ("No person . . . shall be naturalized unless such applicant . . . during all the periods referred to in this subsection has been and still is a person of good moral character[.]"). The statutory review period extends from five years proceeding the date of the application up through the oath of allegiance. *See id.*; 8 C.F.R. § 316.10(a)(1); *Reve*, 241 F. Supp. 2d at 471.

It is undisputed that Rebelo served a two-year term of probation for his aggravated assault conviction from September 8, 1995 through July 14, 1997, that Rebelo's application for naturalization was approved on October 31, 1995, and that Rebelo took the oath of allegiance on December 7, 1995. (Request for Admissions, Section II ¶¶ 14–18; Probation Record.) Thus, if valid, the probation regulation rendered Rebelo ineligible for naturalization during his term of probation, rendering Rebelo's December 1995 naturalization illegally procured. *See, e.g., Kiang*, 175 F. Supp. 2d at 949, *aff'd*, 56 F. App'x at 698; *United States v. Vlamakis*, No. 01-2396, 2002 WL 230909, at *4 (N.D. Ill. Feb. 15, 2002).

Rebelo takes issue not with the substance of the probation regulation, but with the procedural validity of its adoption. Because the probation regulation was not promulgated pursuant to the notice and comment and delayed effectiveness requirements of the Administrative Procedure Act, 5 U.S.C. § 553(b)–(d), but rather was initially imposed by the Attorney General as an interim rule, Rebelo argues that this Court should disregard the probation regulation under the well-established rule that regulations conceived beyond the confines of the APA are null void. *See, e.g., Texaco, Inc. v. Fed. Power Comm'n*, 412 F.3d 740, 742–46 (3d Cir. 1969). The Government does not contest that the probation regulation qualifies as a substantive

regulation that is typically subject to APA rulemaking requirements. Rather, the Government responds that the probation regulation qualifies for the "good cause" exemption to the notice and comment and delayed effectiveness requirements of the APA.

Section 553 of the APA exempts federal agencies from the notice and comment rulemaking requirements "when the agency for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). Likewise, "good cause" exempts an agency from the typical 30-day delayed effectiveness applicable to rules promulgated under § 553. *See id.* § 553(d)(3). Courts have tended to construe this "good cause" exception narrowly in order to preserve the procedural safeguards of the APA. *E.g., Sharon Steel Corp. v. EPA*, 597 F.2d 377, 379 (3d Cir. 1979); *see also Asiana Airlines v. FAA*, 134 F.3d 393, 396 (D.C. Cir. 1998) ("We have looked askance at agencies' attempts to avoid the standard notice and comment procedures, holding that exceptions under § 553 must be 'narrowly construed and only reluctantly countenanced' in order to assure that 'an agency's decisions will be informed and responsive.'") (citation omitted). Our Circuit has recognized that the imminence of a statutory deadline generally does not constitute good cause exempting an agency from the § 553 requirements if it is possible for the agency to both comply with the statutory deadline and the notice and comment requirements. *E.g., Natural Res. Def. Council v. EPA*, 683 F.2d 752, 765 (3d Cir. 1982) (citations omitted). Yet, where the rulemaking deadline imposed by Congress places the administrative agency in a bind such that adherence to APA requirements would prevent the statutory program from having effect, courts will defer to an agency's assertion of the good cause exception. *E.g., Phila. Citizens in Action v. Schweiker*, 669 F.2d 877, 882–87 (3d Cir. 1982) (permitting the Department of Health and

18

Human Services, acting on a 49-day deadline, to issue interim rules that would provide guidance to the states on cost-cutting measures for welfare programs); *cf. Am. Iron & Steel Inst. v. EPA*, 568 F.2d 284, 292 (3d Cir. 1977) ("'Impracticable' means a situation in which the due and required execution of the agency functions would be unavoidably prevented by its undertaking public rule-making proceedings.") (quoting S. Rep. No. 79-752, 1st Session at 16 (1945)). Accordingly, this Court must subject the Attorney General's statement of good cause to careful scrutiny.

The Attorney General initially promulgated the probation regulation on October 7, 1991[7] as part of a comprehensive set of rules, *see* 56 Fed. Reg. 50,475, related to the new administrative naturalization procedure adopted by the Immigration Act of 1990 ("IMMACT"), Pub. L. 101-649, 104 Stat. 4978 (Nov. 29, 1990). The new procedure made naturalization proceedings the exclusive province of the Attorney General, subject to judicial review only on appeal. *Id.* § 401(a), 104 Stat. at 5038, *codified at* 8 U.S.C. § 1421(a) ("The sole authority to naturalize persons as citizens of the United States is conferred upon the Attorney General."); *see* 8 U.S.C. § 1421(c) (judicial review). Prior to IMMACT, the INS made recommendations regarding naturalization, but federal courts had ultimate authority over naturalization proceedings. 56 Fed. Reg. at 50,475. Having been vested with ultimate decision-making authority over naturalizations by IMMACT, the Attorney General designed the interim rules "to achieve uniformity and to facilitate the acquisition of United States citizenship for qualified

---

[7]The probation regulation was retained in the subsequent, second interim rules issued in 1993 and in the final rules issued in 1995. *See* 58 Fed. Reg. 49,905 (Sept. 24, 1993); 60 Fed. Reg. 6647 (Feb. 3, 1995). Neither update of the rules acknowledged comments received relating to the probation regulation.

19

aliens, [by] . . . incorporat[ing], to the fullest extent practicable, those judicial precedents and INS

interpretations that have been clearly established under the prior statute and that are still

applicable to the Act as amended." *Id.* at 50,475–76. The Attorney General also intended the

interim rules

> to create a logical and more concise approach to the issues of citizenship eligibility;
> to incorporate those definitions and accepted principles of substantive and procedural
> naturalization law that the INS will apply in making its determinations; and to
> achieve greater consistency in decision making by clarifying INS practices and
> procedures for the benefit of both the public and Service personnel.

*Id.* at 50,476. Because IMMACT transferred jurisdiction over naturalizations to the Attorney

General effective October 1, 1991, the Attorney General provided that the interim rules would

have retroactive effect to that date. *Id.* at 50,475.

The initial interim rules included the following statement of good cause for the Attorney

General's decision not to follow the APA's notice and comment requirements:

> The Service's implementation of this rule as an interim rule, with provision for
> post-promulgation public comment, is based upon the "good cause" exception found
> at 5 U.S.C. 553 (d)(3). Section 408(b) of IMMACT specifically authorizes the
> Attorney General to promulgate regulations on an interim final basis to implement,
> in a timely manner, changes made to the Administrative Naturalization provisions of
> the Act. Those changes, which remove naturalization authority from the courts and
> confer it upon the Attorney General, become effective on October 1, 1991. *Unless*
> *this regulation is issued in interim final form, no administrative procedures will exist*
> *on October 1 for the processing and determination of naturalization applications.*
> *This situation would result in delay, since the Service could not act to schedule*
> *interviews for naturalization or otherwise to process applications until regulations*
> *became effective.* Accordingly, publication of this rulemaking on an interim basis is
> necessary in order to ensure efficient operation of the naturalization process.

*Id.* at 50,479 (emphasis added). In lieu of the APA's advance notice and comment requirements,

the interim rules provided for post-promulgation comments,[8] which would be considered and implemented as necessary in future variants of the rules. *Id.*

Rebelo argues that the 10-month period between the passage of IMMACT on November 29, 1990 and the transfer of naturalization jurisdiction it mandated for October 1, 1991 provided ample time for the INS to promulgate necessary regulations in accordance with the notice and comment requirements of the APA. This Court is not convinced. The transfer of naturalization authority from the federal courts to the Attorney General (and by delegation, the INS) constituted a substantial change to immigration law,[9] effectively supplementing one adjudicatory tribunal for another for the processing of the hundreds of thousands of naturalization applications filed each year. *See* James Lee & Nancy Rytina, Department of Homeland Security, Office of Immigration Statistics, Annual Flow Report March 2009, Naturalizations in the United States: 2008 at 2 (2009) ("The average annual number of persons naturalizing increased from less than 120,000 during the 1950s and 1960s to 210,000 during the 1980s, [and] 500,000 during the 1990s[.]"), *available at* http://www.dhs.gov/xlibrary/assets/statistics/publications/natz_fr_2008.pdf. Consequently, the INS had to assume a comprehensive body of law governing not just procedures for naturalization, but also the substantive components of eligibility for naturalization

---

[8]The Court notes that the provision for post-promulgation comment does not excuse the failure to follow the APA's advance notice and comment requirements. *E.g.*, *Natural Res. Def. Council*, 683 F.2d at 768.

[9]Indeed, the Attorney General described the adoption of administrative naturalization as "the first major change in the naturalization process in nearly eighty-five years." 56 Fed. Reg. at 50,475 ("The most significant changes resulting from the passage of IMMACT arise from the authority now conferred upon the Attorney General to make final determinations on applications for naturalization. Under the Designated Examiner system, which dates back to reform provisions of the Naturalization Act of June 29, 1906, 34 Stat. 596, the Attorney General was limited to making recommendations about naturalization eligibility to the courts.").

required by federal law.[10] Even without the notice and comment and delayed effectiveness
requirements of the APA, it appears the Attorney General had difficulty preparing the
voluminous interim rules[11] in time for the October 1, 1991 deadline, as evidenced by the date of
the interim rules (October 7, 1991). And notwithstanding the continued efforts of the INS to
efficiently process naturalization applications, the agency amassed a substantial backlog of
applications between the time of the initial interim rules, the second interim rules (issued
September 24, 1993), and the final rules (issued February 3, 1995). *See* Department of Justice,
Office of the Inspector General, Special Report, An Investigation of the Immigration and
Naturalization Service's Citizenship USA Initiative, The Implementation of CUSA: an Overview
at 1 n.2 (2000) (noting an INS backlog of approximately 300,000 applications at the end of fiscal
year 1994, and nearly 700,000 applications by the end of fiscal year 1995). Had the Attorney

---

[10]Rebelo appears to distinguish between the INS's ability to promulgate interim
procedural rules as opposed to substantive rules. However, the Court is unable to discern
Rebelo's basis for making this distinction. Neither IMMACT nor the interim rules containing
the probation regulation limited the Attorney General's promulgation authority to procedural
rulemaking. Considering that the IMMACT conferred upon the Attorney General, and, by
delegation, the INS, an adjudicative function, it naturally follows that the INS would need
guidelines, premised on the prevailing authority from then-existing case law, on the substantive
eligibility requirements for citizenship in order to efficiently process applications. Furthermore,
courts tend to defer to an agency's substantive interpretations of law "unless they are arbitrary,
capricious, or manifestly contrary to the statute." *Chevron U.S.A., Inc. v. Natural Res. Defense
Council*, 467 U.S. 837, 844 (1984) (citations omitted). Not only does Rebelo fail to identify an
unambiguous statutory provision contradicted by the probation regulation, but, so far as the Court
can tell, he does not challenge the substance of the probation regulation. In accordance with the
well-established principles of *Chevron* deference, the Court sees no reason to strike down the
probation regulation. *See, e.g., Kiang*, 175 F. Supp. 2d at 949, *aff'd*, 56 F. App'x at 698; *Jiminez
v. Eddy*, 153 F. Supp. 2d 1105, 1107–08 (D. Alaska 2001).

[11]The October 7, 1991 interim rules comprise some 28 pages of the Federal Register.
Although the other regulations contained in the interim rules do not bear upon the disposition in
this case, the Court notes that Rebelo's APA argument calls into question the validity of all the
regulations contained therein.

General not implemented the interim rules on October 7, 1991, the INS would have been bereft of guidelines as it embarked upon the daunting task of processing the hundreds of thousands of applications on its growing docket. After careful consideration of the relatively short timeline confronted by the INS, and in light of the full panoply of naturalization decision-making functions it was assuming pursuant to IMMACT, this Court is satisfied that the Attorney General had good cause for bypassing the typical APA requirements.[12]

This Court's conclusion is bolstered by IMMACT's express instruction that the Attorney General "*shall* prescribe regulations (on an interim, final basis or otherwise) to implement the amendments made by this title *on a timely basis*." Pub. L. 101-649 § 408(b), 104 Stat. at 5047 (emphases added). In the context of a Title adopting a new policy for administrative naturalization under the exclusive authority of the Attorney General, this statutory mandate, which emphasizes the need for timely rulemaking by the Attorney General, and which authorizes the promulgation of interim, final, or other regulations, bespeaks Congress's clear intent that the Attorney General did not have to adhere to the rulemaking requirements of the APA. *See Asiana Airlines*, 134 F.3d at 398–99 (finding that statutory mandate "to issue not a proposed rule, but an 'interim final rule,'" where the legislation demanded rapid agency action, indicated Congress's clear intent for the agency to bypass the APA requirements).

---

[12]Rebelo relies on *Louis v. Nelson*, where the district court invalidated an immigration detention rule on the basis that it was promulgated contrary to the procedures required by the APA. 544 F. Supp. 973, 997 (S.D. Fla. 1982). However, that case, which predates the IMMACT and the probation regulation, did not involve an agency's assertion of the good cause exemption or a statutory provision directing the agency to adopt interim rules. *See id.* at 993 (noting the Government's position that the challenged regulation was not a "rule" subject to the APA, and, alternatively, that the foreign policy and agency organization exceptions, 5 U.S.C. § 553(a)(1), (b)(A), exempted the regulation from APA requirements).

23

Other courts have sustained the probation regulation in the face of substantive attack. *E.g.*, *Kiang*, 175 F. Supp. 2d at 949, *aff'd*, 56 F. App'x at 698; *Jiminez v. Eddy*, 153 F. Supp. 2d 1105, 1107–08 (D. Alaska 2001); *see also Keaik v. Dedvukay*, 557 F. Supp. 2d 820, 829 (E.D. Mich. 2008) (denying appeal petitioner's application for naturalization based in part on the petitioner's failure to demonstrate he had completed his term of probation in accordance with the probation regulation). Now, in the face of procedural attack, this Court will not invalidate the probation regulation. Because Rebelo does not dispute that he was on probation during the statutory review period, he was ineligible for naturalization, rendering his subsequent naturalization illegally procured. The Government has met the high burden for summary judgment. No genuine issue of material fact remains. Accordingly, the Court will grant the Government's motion to revoke Rebelo's order and certificate of naturalization.

### C. Willful Misrepresentation & Concealment of Material Facts

The Government also seeks denaturalization on the basis of Rebelo's false statement, made on affirmation under penalty of perjury on his Application, regarding his criminal history. Although he claims that he does not know who wrote the statement and that he does not recall reading the statement (Dep. of Marco P. Rebelo, Oct. 7, 2003 at 94:14-23), Rebelo admits that his Application was genuine, that he signed the Application, and that he attached the following answer to the Application as a supplement to Question 15: "Supplement to #15, Elizabeth, N.J., Marco P. Rebelo, May 14, 1995, Disorderly Persons Offense, Charges Dismissed" (Request for Admissions, Section I, Section II ¶¶ 1, 5). Question 15 asked, "Have you ever . . . been arrested, cited, charged, indicted, convicted, fined or imprisoned for breaking or violating any law or ordinance excluding traffic regulations?" (Application at 3.) Further, Rebelo does not contest

24

that this statement was both (i) affirmatively false in asserting that a disorderly persons offense

had already been dismissed, and (ii) incomplete by neglecting to mention the six charges filed

against him, none of which were disorderly persons charges, pursuant to his arrest. (*See* Dep. of

Marco P. Rebelo, Oct. 7, 2003 at 58–60, 90; *cf.* Plea Form ¶ 12.) Nevertheless, Rebelo argues

that the false statement is excusable because it was made on the advice of his attorney and

because he was never ultimately convicted of a crime involving moral turpitude. Thus, Rebelo

contends that the Government has not established the willfulness and materiality[13] prongs of the

*Kungys* test. *See Kungys*, 485 U.S. at 767. Both arguments lack merit.

With regard to willfulness, the Government need not prove that Rebelo intended to

deceive the INS with his statement. *Witter v. INS*, 113 F.3d 549, 554 (5th Cir. 1997) ("The

element of willfulness is satisfied by a finding that the misrepresentation was deliberate and

voluntary.") (citation omitted); *Forbes v. INS*, 48 F.3d 439, 442 (9th Cir. 1995) (citation

omitted). "Rather, knowledge of the falsity of the representation is sufficient" to establish

willfulness. *Forbes*, 48 F.3d at 442; *see also Bufalino v. INS*, 473 F.2d 728, 739 (3d Cir.)

(finding that willfulness under § 241(a)(5) of the INA did not require evil motive or bad

purpose), *cert. denied*, 412 U.S. 928 (1973). Rebelo directs the Court's attention to a number of

patent law cases acknowledging the availability of a defense for parties that acted in good faith

reliance on the advice of legal counsel. From these cases, the Court understands that a party's

---

[13]The Court construes Rebelo's vague reference to the fourth factor of the *Kungys* test (*see* Def.'s Br. on Remand at 13) to refer to materiality, rather than causation, because Rebelo presents no evidence suggesting that the INS would have treated his application in the same fashion as it actually did if it had known all the facts of his criminal history. Thus, the Court understands Defendant to be arguing that his omissions on the Application were immaterial because they concealed no bar to naturalization, and thus would not have had a tendency to affect the consideration of his application.

"failure to seek legal advice is a factor that supports a finding of willful infringement. . . . [And] [c]onversely, a party's reliance on the advice of counsel is a factor that militates against a finding of willfulness." *Keyes Fibre Co. v. Packaging Corp. of Am.*, 763 F. Supp. 374, 375 n.1 (N.D. Ill. 1991). However, after thorough research, the Court is unaware of any cases recognizing such a defense to willfulness under the INA.

Assuming *arguendo* that good faith reliance on the advice of counsel could establish a complete defense against willfulness in a denaturalization proceeding, the undisputed facts in this case satisfy the Court that Rebelo has not presented a genuine issue of willfulness for resolution at trial. This Court cannot accept that Defendant acted in good faith reliance of legal counsel in providing the decidedly false and incomplete answer that a disorderly persons charge had already been dismissed, when the question broadly asked about *any* arrests, citations, charges, indictments, or convictions. Whether he wrote or read it, Defendant knew about the supplemental answer and submitted it with his application *the day before* his scheduled hearing in Superior Court, and his deposition testimony reflects that he was aware of multiple pending charges on the date that he prepared his Application. (Dep. of Marco P. Rebelo, Oct. 7, 2003 at 58–60 (acknowledging awareness of multiple pending charges at the time he prepared his Application); *see also id.* at 90 (expressing expectation that the charges *would* be dismissed in the future).) The deposition testimony of his father supports this Court's understanding. Not only does his father's testimony reflect that Rebelo was aware of the pending charges at the time, but it notes that no attorney who was actually working on Rebelo's case was present when he completed the application. (*See* Montana Decl., Ex. Y (Dep. of Alberto Rebelo, Dec. 3, 2003) at 29, 31 (acknowledging that, on the day Rebelo completed his Application, his son had told a

26

group of people that he had a problem with the May 14 arrest, and admitting that Rebelo knew the charges had not been dismissed when he completed the Application), 33 (conceding that no attorney who was working on Rebelo's case was present to assist with the Application).) Rebelo has no answer for these admissions. Moreover, Rebelo's subsequent failure to correct his criminal history answer or report his aggravated assault conviction while his application was pending reflects his intent to conceal his criminal history from the INS.[14] Having considered the above admissions and undisputed facts, the Court finds as a matter of law that Rebelo's reliance on the advice of counsel is best described as an act of willful blindness rather than good faith.

With regard to materiality, "the test . . . is whether the misrepresentation or concealment had a natural tendency to produce the conclusion that the applicant was qualified." *Kungys*, 485 U.S. at 759. The fact that this Court now concludes that Rebelo was not convicted of a crime involving moral turpitude does not render Rebelo's false statements immaterial. At the time Rebelo submitted the statement, it is undisputed that he had been arrested on charges of aggravated assault of a police officer, resisting arrest, obstruction of the administration of law, and making terroristic threats. (Pl.'s L. Civ. R. 56.1 Statement at 4–5; Police Reports at 8; Plea Form ¶ 12.) As the Court noted above, at least one of the charges potentially entailed morally turpitudinous conduct. *See supra* Part III.A (discussing criminal complaint charging Rebelo with attempt to cause bodily injury, and the ramifications of intent under *Partyka*). Furthermore, after Rebelo pled guilty and was sentenced to probation, he was not eligible for citizenship when he

---

[14]Pursuant to the good moral character requirement, Rebelo bore the continuing burden to correct his false statements while his application was pending. *See* 8 U.S.C. § 1427(a)(3); 8 C.F.R. § 316.10(a)(1); *Reve*, 241 F. Supp. 2d at 477 (recognizing that the applicant failed to correct his misstatements concerning his criminal history).

naturalized under the probation regulation.

The Government has presented the declaration of the INS officer who approved Rebelo's Application, wherein the officer attests that he would have proceeded differently with Rebelo's Application, and ultimately would have recommended denying the Application if he had known the full extent of Rebelo's criminal history, including such facts as his contemporaneous term of probation. (Parra Decl. ¶¶ 5, 8–13.) *Cf. Reve*, 241 F. Supp. 2d at 477 (noting that the defendant's naturalization application "would have received far more scrutiny had he answered the queries as to his criminal record with candor."). Thus, it cannot be gainsaid that Rebelo's Application statements and omissions did not have the natural tendency of affecting the INS's review of his application. *See United States v. Schiffer*, 831 F. Supp. 1166, 1204 (E.D. Pa. 1993) (noting that the applicant's misrepresentations concerning his criminal history were material because they "clearly thwarted an avenue of inquiry that would have led to disqualifying information"), *aff'd*, 31 F.3d 1175 (3d Cir. 1994). Rebelo's willful misrepresentation and concealment of his true criminal history had the natural tendency of preventing the INS from learning of his probation and making a determination of good moral character on the basis of all relevant facts. *Kungys* requires nothing more.

Rebelo does not otherwise challenge the Government's proof under the *Kungys* test. The Government has presented clear and unequivocal evidence that Rebelo made a false and deceptively incomplete statement on his naturalization application, that Rebelo acted willfully in submitting the false statement and in declining to correct his statement prior to his naturalization, that the statement concerned a material fact, and that the false statement resulted in Rebelo's naturalization. For these reasons, the Court finds that Rebelo wrongfully procured naturalization,

and the Court will grant the Government's motion to revoke Rebelo's order and certificate of naturalization.

## IV.    CONCLUSION

For the aforementioned reasons, the Court will grant the Government's reinstated motion for summary judgment and deny Rebelo's reinstated cross-motion for summary judgment. Accordingly, the Court will revoke the order admitting Rebelo to citizenship and cancel his certificate of naturalization, with such revocation and cancellation effective as of the date of the order and certificate.  An appropriate form of order accompanies this Memorandum Opinion.

Dated: August 20, 2009

/s/ Garrett E. Brown, Jr.
GARRETT E. BROWN, JR., U.S.D.J.